UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE


DAVID McNISH,                                    )
                                                 )
                    Petitioner,                  )
                                                 )
v.                                               )          No.:    2:00-cv-95
                                                 )                  (Judge Phillips)
                                                 )
RICKY BELL, Warden,                              )
                                                 )
                    Respondent.                  )


## MEMORANDUM


This is a petition for the writ of habeas corpus pursuant to 28 U.S.C. § 2254.

Petitioner David McNish ("McNish" or "petitioner") is incarcerated on death row.  The

matter is before the court on the respondent's motion for summary judgment and McNish's

response thereto, and McNish's motion for summary judgment and respondent's response

thereto.  For the following reasons, McNish's motion for summary judgment [Court File No.

102] will be **DENIED**, the respondent's motion for summary judgment [Court File No. 76]

will be **GRANTED**, and the petition for habeas corpus relief, as amended, will be **DENIED**.

I.      Factual Background and Procedural History

The respondent, through the Attorney General for the State of Tennessee, has provided the court with copies of the relevant documents as to McNish's direct appeal and post-conviction proceedings. [Court File No. 17, Notice of Filing Documents, Addenda 1-8; Court File No. 72, Addendum 3, volumes 1 & 2].[1] McNish was convicted by a jury in Carter County, Tennessee, of the first degree murder of Gladys Smith, a 70-year-old widow, and was sentenced to death. The conviction and sentence were affirmed on direct appeal. *State v. McNish*, 727 S.W.2d 490 (Tenn.), *cert. denied*, 484 U.S. 873 (1987). The facts that led to the conviction of McNish/appellant are set forth in detail in the opinion of the Tennessee Supreme Court:

> Mrs. Smith lived alone in an upstairs apartment in the Lynnwood Apartments in Elizabethton, Tennessee. The parents of appellant had an apartment in the same complex of apartment buildings, as did Mrs. Selena Richardson (who was at that time Mrs. Selena Welch), whom appellant had been dating. Appellant was 31 years of age at the time of the trial of this case in 1984. He had previously been divorced and at least since the summer of 1982 had been unemployed. He spent a great deal of time in and near the apartment complex, visiting his parents and Mrs. Welch. He testified that he was also a friend of the deceased and had been very attentive to her needs, frequently running errands for her and otherwise assisting her. The testimony

_____

[1]Addendum 1 contains the technical record (one volume) and transcripts and exhibits (16 volumes and one audiotape) of McNish's trial proceedings; Addendum 3 contains the technical record (one volume) and transcripts and exhibits (three volumes) of McNish's post-conviction proceedings. Generally, the volume number of the transcripts and other documents in the state record does not correspond to the volume number listed by the respondent. The court's reference to the record is to the volume number listed by the respondent in each Addendum, which is designated as Vol. I, Vol. II, and so on. Reference to volume numbers such as volume I, volume II, and so on refers to the volume number of a transcript as designated by the court reporter in the state court proceeding.

was that the victim, Mrs. Smith, was frail, weighing less than one hundred pounds, but that she was still capable of independently living in her own apartment.

Appellant weighed about 165 pounds and held a black belt in karate. Since 1974 he had used prescription drugs rather heavily because he suffered from headaches that grew out of injuries in an automobile accident during that year. He also testified that he purchased street drugs from time to time. Having little income, he sometimes borrowed a few dollars from friends, including Mrs. Smith.

At about 8 p.m. on April 5, 1983, Mrs. Smith was brutally beaten about the head and face with a glass vase, the fragments of which were found in her apartment. It was one of a pair of such vases which belonged to her. The vase itself was shattered by the blows, and the victim's skull was fractured in several places. Hemorrhaging of the brain resulted which compressed the brain stem and prevented breathing. Mrs. Smith died within a short time after the beating, although she was still alive when first found after it occurred.

Appellant had taken a number of sleeping tablets and other drugs during the day on April 5 to relieve a headache, according to his testimony. He had, however, conducted normal activities during that day, having visited Mrs. Welch's apartment at least twice and kept her infant son for a few hours. At about 6:20 p.m. he borrowed her automobile and left the apartment for the purpose of borrowing some money. He returned about 7 p.m. and spoke with two acquaintances in a parking lot of the apartment complex. The three agreed to meet later at the apartment of one of these men to watch television. Appellant told his friend that he needed to borrow some money to purchase beer and that he might try to borrow the money from Mrs. Smith.

Shortly before 8 p.m. Greg Peters, who lived with his wife and infant child in the apartment next to Mrs. Smith, heard loud thumping noises in her apartment. He went outside on the balcony and then heard the sound of glass breaking and moans emanating from her apartment. He testified that as he reached for the door, appellant rushed out of the apartment exclaiming that Mrs. Smith had fallen and was hurt. Peters went inside and found Mrs. Smith, still partially conscious, lying in the kitchen in a pool of blood, with broken glass from a shattered flower vase scattered on the floor. Peters ran outside and called for help.

Mr. Frank Garland, who lived in the apartment directly beneath Mrs. Smith, also heard noises from her apartment. He then heard Peters calling for help, and he saw appellant McNish coming down the steps from the upstairs apartments. He saw nothing unusual in the appearance of appellant at that time. He testified that appellant stopped and spoke to the son of a Mrs. Irene Nave, who lived in the apartment next to Garland. He also spoke to Mrs. Nave briefly at the doorway and then went to the parking lot and drove away in Mrs. Welch's automobile. Other witnesses testified that appellant drove away rapidly. Hearing Peters call again for assistance, Garland went upstairs where he found Mrs. Smith unconscious in her kitchen. He attempted to call for help and had his wife summon the police. Mrs. Nave had also placed a call for an emergency rescue squad, which appeared within a few minutes.

Appellant drove Mrs. Welch's automobile some mile and one-half to two miles to the residence of his former wife, Mrs. Janie Bradley. He had a mishap en route, near a cemetery, and damaged the car slightly. He also claimed that he received some minor injuries in this accident. When he reached the residence of Mrs. Bradley, she testified that his speech was slurred and that he appeared to some extent to be under the influence of a drug or narcotic. He told her that he had taken a number of pills, that he had wrecked Mrs. Welch's car, and that he had been in a fight with someone, whom he would not identify. He said that he had been hit with a "tool." His nose was cut and bruised and there was a cut inside his mouth. There was some blood on his trousers and on his hands.

Appellant requested a bottle of beer, which Mrs. Bradley did not have. She gave him some Tylenol for relief of his headache. He washed his hands and face and lay down briefly. He told Mrs. Bradley that he needed to "get out of there" and asked her to take him to a Mental Health Center in Johnson City, where he had previously received treatment. At her request he drove Mrs. Welch's automobile to a nearby school, parking it in the rear of the kitchen. Mrs. Bradley then drove him in her automobile to his parents' apartment where she obtained for him some fresh trousers. Appellant lay in the back seat of her automobile during this time. She then drove to a nearby market to purchase some bread for his mother, while he changed trousers in the back seat of the car.

As they approached the market, an Elizabethton detective observed the automobile which was similar to that of Mrs. Welch. He had been advised of the beating of Mrs. Smith and of appellant's leaving. He apprehended

appellant as he sat in the back seat of Mrs. Bradley's automobile at the market. He also retrieved appellant's bloodstained trousers from the automobile.

At no time during this interval did appellant state to Mrs. Bradley, to his parents, to Mrs. Welch or to the police officer that Mrs. Smith had been injured or killed, that he had observed her, or that he had any information whatever concerning her. This was emphasized later by the State, after appellant professed to remember the events of the evening and accused Mrs. Welch and Mr. Peters of conspiring to murder Mrs. Smith.

Appellant was taken to police headquarters by a county deputy sheriff who said that appellant volunteered to him the statement, "I guess I'm in trouble for what I did."

Appellant denied making this statement. The deputy testified that he had not questioned appellant either before or after the statement was made and that he did not pursue the matter further, other than to tell appellant that he did not wish to talk with someone who had beaten an elderly lady. This evoked no response from appellant, according to the deputy.

When appellant was subsequently questioned at police headquarters he denied any knowledge of the incident involving Mrs. Smith. He stated that he was partially under the influence of narcotics, but at no time did he admit any involvement in the beating of Mrs. Smith which subsequently resulted in her death. Police officers who took appellant's statement testified that it was given voluntarily and after appellant was fully advised of his rights. They testified that appellant appeared to be somewhat under the influence of some intoxicant, although they detected no odor of alcohol, and all of them testified that he appeared in full command of his faculties. Tests of his blood later revealed small traces of sedatives, but a toxicologist called on behalf of appellant at trial testified that these were not mind-altering and, in the quantities found present in his blood, would not have caused him to appear abnormal or irrational to persons observing him.

Scientific tests of the blood found on appellant's trousers showed that it matched that of the victim, Mrs. Smith, and that it was not the blood of appellant. Some blood particles taken from his fingernails were found to be human blood, but it was in quantities too small to test. An analysis performed at the Tennessee Bureau of Investigation laboratories showed that a fragment of glass found inside the packaging material in which appellant's trousers had

been transmitted matched the glass particles found on the rug and floor of Mrs. Smith's apartment.

Throughout the weeks and months immediately following the death of Mrs. Smith, appellant remained silent and adhered to the position that he knew nothing whatever about the subject. Some seven months after her death, however, in November 1983, he wrote a letter to the District Attorney stating that he had known all along that two other persons were responsible for her death and had conspired to kill her. He gave a statement to the District Attorney, which was similar to his later testimony at the trial, to the effect that Mrs. Welch, who was nineteen years old, was jealous of him and suspected him of being sexually intimate with the 70–year-old Mrs. Smith. He also stated to the police and later testified at trial that Peters disliked Mrs. Smith and that he had heard Mrs. Welch and Mr. Peters threatening to murder her.

Appellant stated that on April 5, 1983 he had gone to Mrs. Smith's apartment to borrow some money from her when he happened upon Greg Peters "standing there, shaking her by the hair of the head, telling her to shut up." He struggled with Peters until the latter struck him on the bridge of his nose and knocked him unconscious. When he recovered, appellant found Mrs. Smith lying in the kitchen and attempted to move her to a couch in the living room but was unable to do so. He stated that he heard Peters making noise outside but by the time appellant reached the door, someone else had come up the stairs. Appellant advised this other person that Mrs. Smith was injured and needed assistance. He followed this other person into Mrs. Nave's apartment where he asked Mrs. Nave to call the rescue squad. Appellant claimed that he was "all to pieces" and so severely emotionally shaken by the events that he needed to talk to someone and decided to go to a mental health center. Unable to drive safely, however, he went to the home of his former wife for assistance. He ascribed his behavior during the evening to confusion, fear and the effects of drugs.

There was much conflicting testimony at the trial as to whether Peters was or was not involved in the homicide, and major issues of credibility of appellant as well as other witnesses were presented to the trier of fact. Appellant was severely cross-examined and impeached with respect to the inconsistency between his conduct and statements on the evening of April 5, 1983, and the statement which he gave to the police seven months later, the latter being essentially similar to his trial testimony.

The jury obviously did not accept appellant's version of the events surrounding the homicide of Mrs. Smith and found appellant guilty of murder in the first degree. The record abundantly supports that verdict. Mrs. Smith was mercilessly beaten to death by repeated blows by an assailant who was obviously much more powerful than she. Appellant was shown both by the testimony of Peters and by his own statements and testimony to have been in her apartment, from which he fled quickly and without any satisfactory explanation. He consistently denied knowing anything about her homicide or being involved until months later, at which time he presented a rather bizarre and insubstantial story seeking to implicate Peters and appellant's former girl friend, Mrs. Welch, from whom he had by that time become estranged.

There was ample evidence of every element to establish murder in the first degree, including premeditation as demonstrated by the numerous severe and crushing blows inflicted upon the victim.

*Id.* at 491-94.

In sentencing McNish to death, the jury found that the murder was "'especially heinous, atrocious, or cruel in that it involved torture or depravity of mind....'" *Id.* at 491 (quoting Tenn. Code Ann. § 39-2-203(i)(5) (repealed)).[2] The Tennessee Supreme Court found that the evidence supported this finding because it showed "that the victim was beaten several times and that she remained alive and at least partially conscious throughout her ordeal." *Id.* at 494. In addition, "[t]he jury found that no mitigating circumstance was established sufficient to outweigh the aggravating circumstance established by the evidence." *Id.*

---

[2]After McNish's conviction became final, section 39-2-203 of the Tennessee Code Annotated was repealed and replaced with section 39-13-204, effective November 1, 1989. Act 1989, ch. 591, § 1.

McNish next filed a petition for post-conviction relief, which was denied after an evidentiary hearing. The Tennessee Court of Criminal Appeals affirmed the denial of post-conviction relief. *McNish v. State*, No. 03C01-9712-CR-00550, 1999 WL 604436 (Tenn. Crim. App. Aug. 12, 1999), *perm. app. denied, id.* (Tenn. March 6, 2000). McNish then filed the pending petition for federal habeas corpus relief, which was subsequently amended.

II.    Standard of Review

The Attorney General contends that several of McNish's claims are procedurally defaulted. As to the remaining claims, the Attorney General argues that the respondent is entitled to judgment as a matter of law based on the findings of the Tennessee state courts.

*A. Procedural Default*

The doctrine of procedural default is an extension of the exhaustion doctrine. A state prisoner's petition for a writ of habeas corpus cannot be granted by a federal court unless the petitioner has exhausted his available state court remedies. 28 U.S.C. § 2254. This rule has been interpreted by the Supreme Court as one of total exhaustion. *Rose v. Lundy*, 455 U.S. 509 (1982). Thus, each and every claim set forth in the federal habeas corpus petition must have been presented to the state appellate court. *Picard v. Connor*, 404 U.S. 270 (1971). *See also Pillette v. Foltz*, 824 F.2d 494, 496 (6th Cir. 1987) (Exhaustion "generally entails fairly presenting the legal and factual substance of every claim to all levels of state court review.").

Moreover, the substance of the claim must have been presented as a federal constitutional claim. *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996).

McNish cannot file another state petition for post-conviction relief. Tenn. Code Ann. § 40-30-102(a). Accordingly, he has no remedy available to him in the Tennessee state courts for challenging his conviction and is deemed to have exhausted his state remedies.

It is well established that a criminal defendant who fails to comply with state procedural rules which require the timely presentation of constitutional claims waives the right to federal habeas corpus review of those claims "absent a showing of cause for the non-compliance and some showing of actual prejudice resulting from the alleged constitutional violation." *Wainwright v. Sykes*, 433 U.S. 72, 84 (1977). *Accord Engle v. Isaac*, 456 U.S. 107, 129 (1982) ("We reaffirm, therefore, that any prisoner bringing a constitutional claim to the federal courthouse after a state procedural default must demonstrate cause and actual prejudice before obtaining relief.").

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

"When a state-law default prevents the state court from reaching the merits of a federal claim, that claim can ordinarily not be reviewed in federal court." *Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991). Therefore, to excuse his procedural default, McNish

must first demonstrate cause for his failure to present an issue to the state courts. "[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986).

## B. State Court Findings

On April 24, 1996, President Clinton signed into law the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). The AEDPA significantly restricted the federal courts' jurisdiction to consider and grant habeas corpus relief to state prisoners. Pursuant to 28 U.S.C. § 2254(d), as amended by the AEDPA, McNish may not obtain federal habeas corpus relief with respect to a claim that was adjudicated on the merits in a state court proceeding unless the state court decision (1) was contrary to, or involved an unreasonable application of, clearly established federal law or (2) was not reasonably supported by the evidence presented to the state court. In addition, findings of fact by a state court are presumed correct and McNish must rebut the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e).

The Supreme Court, in *Williams v. Taylor*, 529 U.S. 362 (2000), clarified the distinction between a decision "contrary to," and an "unreasonable application of," clearly established Supreme Court law under § 2254(d)(1). A state court decision is "contrary to" Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently

than [the Supreme Court] has on a set of materially indistinguishable facts." *Id*. at 413. A state court decision "involves an unreasonable application of clearly established Federal law" only where "the state court's application of clearly established federal law was objectively unreasonable." *Id*. at 409. A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411.

Recent case law indicates what a high bar a habeas petitioner must meet under the standard set by the AEDPA. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision. *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "[A] habeas court must determine what arguments or theories supported or ... could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Id*. The Supreme Court acknowledges this is a very high standard. "If this standard is difficult to meet, that is because it is meant to be." *Id*. *See also Renico v. Lett*, 130 S. Ct. 1855, 1866 (2010) ("AEDPA prevents defendants -- and federal courts -- from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts."); *Peak v. Webb*, 673 F.3d 465, 472 (6th Cir. 2012) ("[T]he Supreme Court has very recently made

abundantly clear that the review granted by the AEDPA is even more constricted that AEDPA's plain language already suggests.") (citing *Harrington v. Richter*, 131 S. Ct. at 786).

## C. Motion for Summary Judgment

The respondent filed his answer to the petition for the writ of habeas corpus and then, after McNish filed an amended petition for the writ of habeas corpus, the respondent filed a motion for summary judgment. McNish subsequently filed a motion for summary judgment on his claim that the pre-1989 "heinous, atrocious and cruel" aggravating circumstance is unconstitutional.

It is well established that a motion for summary judgment, as provided in Rule 56 of the Federal Rules of Civil Procedure, is applicable to habeas corpus proceedings and allows the court to assess the need for an evidentiary hearing on the merits of the habeas petition. *See Blackledge v. Allison*, 431 U.S. 63, 80-81 (1977). Rule 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[3] "In considering a motion for summary judgment, the court must view the facts and all inferences to be drawn therefrom in the light most favorable to the non-

---

[3]A revised version of Rule 56 took effect December 1, 2010. The pending motions for summary judgment were filed prior to that date and are governed by the version of Rule 56 in effect at the time of filing. *See Wheeler v. Newell*, No. 09-4549, 2011 WL 204457 at *2 n.3 (6th Cir. Jan. 24, 2011) (unpublished decision).

moving party." *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987). *See also Kochins v. Linden-Alimak, Inc.*, 799 F.2d 1128, 1133 (6th Cir. 1986); *Securities and Exchange Commission v. Blavin*, 760 F.2d 706, 710 (6th Cir. 1985).

The burden is on the moving party to conclusively show that no genuine issue of material fact exists. *Smith v. Hudson*, 600 F.2d 60, 63 (6th Cir. 1979). Once the moving party presents evidence sufficient to support a motion for summary judgment, the non-moving party is not entitled to a trial merely on the basis of allegations. The non-moving party must present some significant probative evidence to support its position. *White v. Turfway Park Racing Association, Inc*., 909 F.2d 941, 943-44 (6th Cir. 1990); *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 861 (6th Cir. 1986).

Summary judgment should not be disfavored and may be an appropriate avenue for the "just, speedy and inexpensive determination" of an action. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). The moving party is entitled to judgment as a matter of law "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id*. at 322.

III. Claims for relief

The court will consider McNish's claims for relief, as presented in his amended petition for writ of habeas corpus and set forth below in bold, in turn and in light of the pending motions for summary judgment.

**I.    In violation of petitioner's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution the State of Tennessee failed to afford him a meaningful opportunity to present the constitutional violations asserted herein, and the state court proceedings in this matter were neither full nor fair.**

This claim concerns McNish's post-conviction proceedings.  Even if true, McNish's allegations regarding the failings of his post-conviction proceedings are not of constitutional dimensions.

> Section 2254 only authorizes federal courts to review the constitutionality of a state criminal conviction, not infirmities in a state post-conviction relief proceeding.  Because there is no federal constitutional requirement that states provide a means of post-conviction review of state convictions, an infirmity in a state post-conviction proceeding does not raise a constitutional issue cognizable in a federal habeas petition.

*Williams-Bey v. Trickey*, 894 F.2d 314, 317 (8th Cir. 1990) (citations omitted); *see also Kirby v. Dutton*, 794 F.2d 245, 247 (6th Cir. 1986); *Williams v. State of Missouri*, 640 F.2d 140, 143 (8th Cir. 1981).  In any event, the allegations lack merit.

**A.    Newly appointed post-conviction counsel were rushed to hearing without the benefit of necessary expert services.**

On March 23, 1990, the Carter County Criminal Court appointed J. Eddie Lauderback and Victor J. Vaughn to represent McNish in post-conviction proceedings, and Mr. Lauderback filed the original petition for post-conviction relief on that date.  [Addendum 3, Vol. 1, Technical Record of Post-Conviction Proceedings at 2-3].  Mr. Vaughn withdrew from representation on September 16, 1992, and Robert Jesse was appointed in his stead as co-counsel.  [*Id*. at 37].  Mr. Jesse subsequently moved to withdraw [*id*. at 49] and on January 5, 1996, Mark Slagle was appointed as co-counsel.  [*Id*. at 50].  Finally, on April 30, 1996,

Mr. Lauderback was allowed to withdraw and the newly-established Office of Post-Conviction Defender was appointed to represent McNish as co-counsel with Mr. Slagle. [*Id.* at 52]. At that time, the post-conviction hearing was continued until June 26, 1996. [*Id.*]. The hearing was again continued until October 1, 1996, on motion of post-conviction counsel. [*Id.* at 61].

In September of 1996 the court denied McNish's *ex parte* motion for expert services, with the exception of the services of attorney Ann Short, who could testify on the subject of ineffective assistance of counsel. [*See id.* at 130]. Evidentiary hearings were held on October 1, 1996, and January 14, 1997; on July 9, 1997, the court filed its findings of fact and conclusions of law, by which the post-conviction petition was denied. [*Id.* at 186].

McNish alleges that newly appointed post-conviction counsel were rushed to a hearing without expert assistance to develop, investigate, and present evidence of constitutional violations in McNish's trial, with the result that significant evidence was left undeveloped and never presented to the state trial court. The Tennessee Court of Criminal Appeals considered and rejected these arguments.

> The procedural history of this post-conviction cause reflects that Defendant filed his original petition for post-conviction relief in March of 1990; and the court appointed representation, including Attorney Eddie Lauderback, on that date. Lauderback represented Defendant with the assistance of a succession of co-counsel until the court replaced him with the newly created Post-Conviction Defender's Office on April 30, 1996. The post-conviction court appointed the last of Lauderback's co-counsel, Attorney Mark Slagle, on January 5, 1996. Slagle continued his representation of Defendant after the appointment of the Post-Conviction Defender's Office, and they coordinated their efforts on behalf of Defendant up to and including the present appeal.

The post-conviction court originally set Defendant's hearing for May 30, 1996, but continued the case until June 26 because the newly created defender's office could not begin its responsibilities on the case until April 30. One week prior to June 26, defense counsel again moved for a continuance, and the trial court reset Defendant's hearing for October 1. No other requests to continue appear in the record. Due to an illness, a defense expert witness could not testify at the October 1 hearing; and the post-conviction court therefore permitted the defense to carry over its proof to the second installment of the hearing, held on January 14, 1997.

Defendant charges that "four months" is "woefully inadequate" to prepare for a post-conviction hearing in a capital case. In addition, he insists that significant evidence remained undeveloped at the time of the hearing. Specifically, he argues, counsel were not able to (1) obtain and analyze all of [former] trial counsel's files; (2) conduct continuing social history interviews of Defendant; (3) interview others from Defendant's social history; (4) gather social history documents and records; and (5) consult with experts regarding results of these efforts.

The State responds that the post-conviction court was "generous" by providing trial counsel adequate time for preparation. According to the State, Defendant had not four months to prepare, but six years, due to the successive chain of counsel as well as the long-time investigation by Defendant's attorney for five years of that time, Eddie Lauderback. The State also notes that the defense did not request the trial court to continue the case for a specific period of time.

We agree with the State that although Defendant characterizes the procedural history on post-conviction as chaotic, the defense remained coordinated enough to adequately prepare for the evidentiary hearing in an appropriate amount of time. Through his continuous, five-year representation, Attorney Lauderback served as the common thread for what might otherwise have been a disjointed effort at defense. Lauderback conveyed the case to Attorney Slagle, who saw the case to the hearing nine months later (and who continues to serve as Defendant's counsel) with the assistance of advocates who specialize in post-conviction capital cases. Finally, Defendant gained additional time when the trial court continued the proof for three and one-half months to permit in-court testimony by the defense expert witnesses.

Based on the facts in the record, we find that the post-conviction court did not violate due process by denying Defendant additional time in which to prepare for the post-conviction evidentiary hearing.

*McNish v. State*, 1999 WL 604436 at **6-7 (citation omitted).

McNish contends that there is nothing in the record to support the appellate court's conclusion that Mr. Lauderback was a common thread for the defense, because there was no evidentiary hearing to that effect. McNish has also filed the affidavit of Eddie Lauderback, in which he testifies: "I would not consider myself a 'common thread' of the defense. I did not consider myself lead attorney on the case. The majority of the work which I performed was ministerial." [Court File No. 74, Amended Petition for Writ of Habeas Corpus, Attachment I, Affidavit of J. Eddie Lauderback, p. 2].

The record, however, refutes this notion. Mr. Lauderback filed the original post-conviction petition. [Addendum 3, Vol. I, Technical Record of Post-Conviction Proceedings at 3]. Along with co-counsel Victor Vaughn, he filed an amended post-conviction petition. [*Id*. at 32]. Mr. Lauderback, along with co-counsel Robert Jessee, moved to amend the petition to additional grounds for relief, which motion was granted. [*Id*. at 44, 48]. After Mr. Lauderback was replaced by the Office of Post-Conviction Defender, a second amended post-conviction petition and a third amended post-conviction petition were filed on behalf of McNish. [*Id*. at 71 and 96, respectively].

In addition, McNish fails to demonstrate what evidence was left undiscovered during the six years that his post-conviction proceedings were pending. Based upon the foregoing,

the court finds that the decision of the Tennessee Court of Criminal Appeals was neither

contrary to, nor did it involve an unreasonable application of, federal law.

### B. The state court improperly denied repeated requests for investigative and expert services.

McNish alleges the trial court erred in denying post-conviction counsel's requests for

expert services. In *Ake v. Oklahoma*, 470 U.S. 68 (1985), the Supreme Court held:

> [W]hen a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.

*Id*. at 83. The federal courts have construed *Ake* generally to require the State to provide an

indigent defendant with any expert services that are necessary to present an adequate defense.

*See, e.g., Terry v. Rees*, 985 F.2d 283, 284 (6th Cir. 1993) (defendant improperly denied an

independent pathologist). The defendant, however, has the burden of making a particularized

showing that expert assistance is necessary. *Caldwell v. Mississippi*, 472 U.S. 320, 323 n.1

(1985).

Under Tennessee law, an indigent capital defendant has the right to an ex parte

hearing wherein the trial court "may, in its discretion, determine that investigative or expert

services or other similar services are necessary to ensure that the constitutional rights of the

defendant are properly protected." Tenn. Code Ann. § 40-14-207(b). The Tennessee

Supreme Court has held that this section applies in post-conviction proceedings involving

capital defendants as well as trial proceedings. *Owens v. State*, 908 S.W. 2d 923, 928 (Tenn.

1995). As the Tennessee Court of Criminal Appeals noted on appeal from the denial of post-conviction relief, "[t]o demonstrate necessity, a defendant should meet the same test as required by courts reviewing direct appeals in capital cases: 'The defendant must show that a substantial need exists requiring the assistance of state paid supporting services and that his defense cannot be fully developed without such professional assistance.'" *McNish v. State*, 1999 WL 604436 at *8 (quoting *State v. Evans*, 838 S.W. 2d 185, 192 (Tenn. 1992)).

In this case, the post-conviction court held a telephone conference on petitioner's ex parte motion for expert services but the telephone conference was not transcribed. *Id*. at *9. For that reason, the appellate court found that it could not "examine whether the trial judge abused his discretion" in denying the ex parte motion for services other that those of Ms. Short. *Id*.

Prior to the post-conviction evidentiary hearing, McNish asked the court to reconsider the decision to deny expert services. As the Tennessee Court of Criminal Appeals noted:

> Upon the ex parte hearing of this motion to reconsider, held prior to proof on the first day of Defendant's evidentiary hearing, counsel presented no proof but instead requested the opportunity to have Ann Short appear ex parte at a future date to attest to the need for additional services.
>
> The post-conviction judge indicated that he did not intend to hear substantive proof from Ms. Short in an ex parte proceeding, but that he would treat Defendant's motion for investigative and expert services as a continuing one. The judge instructed Defendant that if he proved deficient representation in the course of the post-conviction hearing, then additional, necessary services would be granted. The judge stated, "Ex parte only means you-you've got a right to ask the court to give you certain funds for services ... not to have the court hear ex parte any substantive evidence."

*Id*.

Based upon Tennessee law, the appellate court found "that the post-conviction judge misstated his authority and duty to hold an ex parte hearing in which Defendant had an opportunity (and indeed a duty, in order to prevail) to present concrete facts tending to show a particularized need for the investigative or expert services." *Id.* at *10. The court concluded, however, that such a finding did not entitle McNish to relief.

> At the motion to reconsider the denial of additional services, Defendant was clearly unprepared to present evidence to show a particularized need for the services. In the absence of a transcript memorializing the evidence presented at his first ex parte teleconference, Defendant cannot bear his burden of proof that the post-conviction judge abused his discretion by denying additional investigative and expert services.

*Id.*

Based upon the foregoing, the decision of the Tennessee Court of Criminal Appeals was neither contrary to, nor did it involve an unreasonable application of, federal law as set forth in *Ake*. There is nothing in the record to demonstrate what expert or investigative services were needed and denied, and petitioner bears the burden of making such a demonstration.

### C. The state court limited the presentation of evidence.

McNish contends that the post-conviction court improperly limited the presentation of evidence at the evidentiary hearing, created a hostile atmosphere by referring to witnesses as irrelevant, and prevented petitioner from developing his grounds for relief. This issue was also raised on appeal from the denial of post-conviction relief, and was considered and rejected by the Tennessee Court of Criminal Appeals:

Defendant next argues that the trial court impaired his right to present evidence to support his case at the post-conviction hearing by limiting the proof advanced during witness Walter William Foster's testimony. Furthermore, he asserts the post-conviction judge created a hostile atmosphere at the evidentiary hearing by referring to witnesses Archie Parlier and Louise McNeil as irrelevant.

In response, the State contends the record demonstrates that the trial court permitted each of these witnesses to fully testify. The State posits that the trial judge simply performed his function as gatekeeper of admissible evidence and that although the judge determined some testimony inadmissible based upon relevancy, he nevertheless permitted questioning as an offer of proof for the record.

### 1. Archie Parlier

When Defendant called Archie Parlier to testify at the post-conviction evidentiary hearing, the State immediately objected on the grounds that his testimony was irrelevant ("outside the scope of th[e] hearing"). The post-conviction judge sustained the State's objection, saying, "I won't consider it as any substantive proof in the case. I think it's an improper impeachment of ... the jury verdict," and permitted Defendant to examine the witness by leading questions for an offer of proof. We find that the trial court's comments were within the proper scope of issuing a ruling on the objection to admissibility of the evidence and therefore not for the purpose or to the effect of creating a hostile atmosphere. Moreover, the trial judge permitted a thorough examination of Parlier as a proffer into evidence notwithstanding the fact that he had already ruled the testimony outside the scope of post-conviction proof. Only after defense counsel had rested and thereafter reconsidered and resumed questioning did the trial court cease Defendant's proffer. We find no improper limitation on proof.

### 2. Louise McNeil

The post-conviction record reflects that after permitting testimony by Louise McNeil which, when transcribed, spanned several pages, the court sua sponte inquired into the relevancy of the witness. Defendant's counsel explained that he was attempting to elicit information known by McNeil which was critical to Defendant's case at trial.[2] The trial judge replied, "The ... issue of guilt and innocence has already been decided. The Supreme Court affirmed it. And this ... evidence is really irrelevant until you show why it wasn't presented. There might have been a good reason why [McNeil] wasn't

called." In addition, the trial judge expressed, "You've got to prove whether defense counsel knew about this witness, whether there was some reason he didn't call this witness and all that."

[2]McNeil offered the opinion that Greg Peters was a violent person and that she did not want to be alone with him.

Defendant's post-conviction counsel explained, "[The order of witnesses] was just a question of trying to work out the convenience of the attorney's schedules with the witness schedules." Although the trial court seems to have become increasingly impatient with the order of the witnesses, we can find no impermissible restriction of the proof. The trial court permitted McNeil to continue her testimony; furthermore, it appears that the court was primarily concerned with judicial economy: "[I]t seems to me that ... you ought to start off at the top with ... that and not subject everybody to listening to what may be irrelevant proof.[3]

[3]The State provided this footnote, which the Court finds relevant to reproduce: "In fact, it would come out during the questioning of trial counsel Ken Baldwin that McNeil was not called at trial because she had no first-hand knowledge of any violent behavior by Greg Peters."

### 3. Walter William Foster

Similarly, the trial court objected to the time at which former Sheriff's Deputy Foster's testimony was given. Defense counsel called Foster to testify that he had previously been convicted of felonies in Louisiana, information which was not provided to the defense either before or during trial and which the defense argues would have been greatly relevant to impeaching Foster's credibility at trial.[4] The trial court deemed this testimony irrelevant and ordered the witness excused until such time as Defendant "proved to [the trial court] that [Foster's] testimony is material."

[4]At trial, Foster testified that Defendant had told him on the evening of the murder, "I guess I'm in trouble for what I did." In addition, Foster testified that he had failed to report this statement to anyone until shortly before trial (over one year after the occurrence).

The trial court later permitted Foster to testify concerning his convictions and subsequent pardon by the governor of Louisiana. Foster stated that the Sheriff of Carter County (the county of this action) knew about his convictions prior to the trial of this case and that, in fact, Judge Don Lewis, Sheriff George Papantonio, and numerous other law enforcement officers had written letters on Foster's behalf to the governor of Louisiana recommending that Foster be pardoned for his crimes. Finally, Foster admitted that he had not revealed his convictions on his written application to become a Carter County Deputy Sheriff. Defendant has presented no evidence before this Court that the trial court restricted his post-conviction hearing. In addition, we find no evidence that the trial court created a hostile atmosphere by ruling Foster's testimony irrelevant until proven relevant through other witnesses.[5]

> [5]Because we have concluded that the trial court did not create a hostile atmosphere with respect to Defendant's proof, we decline to address whether a hostile atmosphere, in and of itself, can function as a denial of due process in a hearing before the trial court without a jury.

*McNish v. State*, 1999 WL 604436 at **10-11.

The court has reviewed the transcript of the post-conviction hearing and finds that the ruling by the Tennessee Court of Criminal Appeals is supported in the record. Archie Parlier was called as a witness at the hearing by McNish. [Addendum 3, Vol. II, Transcript of Post-Conviction Hearing, volume I, p. 30]. Mr. Parlier was a juror at McNish's trial. [*Id*. at 31]. He was asked the following question, to which the State objected: "Mr. Parlier, during the – during the deliberations did it come to the jurors' attention that there was some outside information about what the meaning of a life sentence was in terms of how long the defendant would serve." [*Id*]. The court sustained the objection, finding that the question was an improper impeachment of the jury's verdict. [*Id*. at 32]. McNish was allowed to make a proffer that the jury's foreperson had opined that, if given a life sentence, McNish

would probably serve "six to eight years" before being released.  [*Id*. at 33].  Mr. Parlier further testified that, had he known McNish would serve a life sentence, it would "[m]ore than likely" have changed his verdict.  [*Id*. at 35].

Louise McNeil was called as a witness for McNish to testify as to Greg Peters' reputation for violence; the purpose of this testimony was to underscore trial counsel's ineffective assistance based upon their failure to call Ms. McNeil as a witness at trial.  [*Id*. at 39-41].  Although the court questioned the relevance of Ms. McNeil's testimony [*id*. at 40], the court nevertheless allowed her testimony to continue.  [*Id*. at 45-47].

Walter William ("Bill") Foster was also called as a witness by McNish.  [*Id*. at 48].  Mr. Foster  was employed as deputy with the Carter County Sheriff's Department at the time of McNish's trial and he testified at said trial.[4]  [*Id*. at 48-49].  He was questioned during the post-conviction hearing as to any prior convictions he had and the State objected.  [*Id*. at 49].  The court declined to hear his testimony until after its materiality was proven.  [*Id*. at 49-50].  Mr. Foster was excused subject to recall.  [*Id*. at 51].

After the conclusion of the testimony of Ken Baldwin, co-counsel for McNish during the murder trial, Mr. Foster was recalled as a witness during the post-conviction hearing.  [*Id*., Vol. III, volume II, p. 192].  At that time, Mr. Foster admitted his prior Louisiana convictions and testified that he had received a full pardon for those convictions.  [*Id*. at 196].  He also testified that he had told the Carter County Sheriff about his pardon, which was long

---

[4]The substance of Mr. Foster's testimony is set forth in detail in section II., *infra*.

before McNish's trial. [*Id*. at 196-200]. In addition, at the conclusion of the October 1, 1996, post-conviction hearing, counsel for McNish was asked whether there were witnesses in addition to Ann Short. [*Id*. at 260]. Counsel observed that, while they might want to recall Mr. Foster, "we pretty much got everything we needed from him I think...." [*Id*.].

Based upon the foregoing, the conclusion of the Tennessee Court of Criminal Appeals that the post-conviction court did not limit the presentation of evidence was neither contrary to, nor did it involve an unreasonable application of, federal law.

### II. The failure to reveal the felony convictions and falsified employment application of Officer Foster violated the doctrines of *Brady/Giglio* and denied Mr. McNish his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

McNish alleges the prosecution withheld exculpatory, mitigating, and/or impeachment evidence in violation of his rights under *Brady* and *Giglio*. In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held "that suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id*. at 87. Impeachment evidence as well as exculpatory evidence "falls within the *Brady* rule." *United States v. Bagley*, 473 U.S. 667, 676 (1985). "Favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different.'" *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995) (quoting *Bagley*, 473 U.S. at 682).

"There are three components of a true *Brady* violation:  The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

In *Giglio v. United States*, 405 U.S. 150 (1972), the Supreme Court considered a situation where the prosecution withheld from the jury the fact that it had promised a key witness that he would not be prosecuted for his part in a crime if he testified against his companion.  Because the witness's credibility was a key issue, the Court found that the government's conduct violated due process and the defendant was entitled to a new trial.  *Id*. at 154-55.  "[D]eliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'"  *Id*. at 153 (quoting *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)).

In order to state a *Giglio* claim a petitioner must demonstrate "(1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false." *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989).  Furthermore, "mere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony."  *Id*.

McNish's *Brady/Giglio* claim concerns the testimony of Deputy Walter William ("Bill") Foster.  Some background is in order.  McNish was arrested by Captain Tom Bowers, a detective with the Elizabethton Police Department, at the Hop-In Market in Elizabethton, Tennessee, on April 5, 1983, the day of Mrs. Smith's murder.  [Addendum I, Vol. 1,

Transcript of the Evidence, volume II, Transcript of Hearing on Motion to Suppress, pp. 111-112]. At the time of the arrest, Captain Bowers called for back-up to transport McNish to the police department. [*Id*. at 129]. Deputy Foster, a deputy with the Carter County Sheriff's Department, was that back-up. [*Id*.]. He transported McNish from the Hop-In Market to the Elizabethton Police Department. [*Id*., Vol. II, volume II, pp. 270-272].

McNish's trial commenced August 8, 1984, with preliminary matters and voir dire of the jury, as well as a hearing on the motion to suppress McNish's statement to Captain Bowers on the evening of his arrest. [*Id*., Vol. 1, Transcript of the Evidence, volume I, p. 1]. Deputy Foster was chosen by the trial court to keep watch over the jurors. At some point, Deputy Foster realized he had some knowledge of the case being tried. He advised the prosecuting attorneys that he had transported McNish to the police department on the day of the murder and that McNish had made a statement to him. The trial court then called for the Sheriff to send someone else over to guard the jury. [*Id*., Vol. II, volume II, pp. 270-278]. Consequently, during the hearing on the motion to suppress McNish's statement to Captain Bowers, which hearing was held prior to the start of the trial, Deputy Foster was called to the stand.[5] Of relevance to the motion to suppress McNish's statement to Captain Bowers, Deputy Foster first testified that, in his opinion, McNish was not under the influence at the time of his arrest. [*Id*. at 272]. He further testified that, while McNish was being taken from

---

[5]The admissibility of this statement is discussed in greater detail in section IX., *infra*.

the Hop-In Market to the Elizabethton Police Department, McNish stated the following: "I guess I'm in trouble for what I did." [*Id*. at 273].

The defense objected to this testimony because they were not given the statement during discovery. [*Id*. at 274-275]. Deputy Foster testified that he had not known until the trial began that the statement he heard was relevant and had not mentioned it to anyone before, with the exception of the dispatcher for the Sheriff's Department. [*Id*. at 276-277]. He also testified that he had no contact with the Elizabethton Police Department, which was investigating the case. [*Id*. at 277]. Deputy Foster further testified that he did not realize the trial that day involved McNish, until he was called by the court to watch the jury. [*Id*.].

During the trial, Deputy Foster was called as the final witness for the prosecution. [*Id*., Vol. III, volume V, p. 648]. The defense moved to suppress McNish's statement to Deputy Foster and, after a hearing on the motion outside the presence of the jury, the trial court denied the motion to suppress. [*Id*. at 648-682]. Deputy Foster then testified before the jury that he was called to transport McNish from the Hop-In Market to the Elizabethton Police Department and, while being transported, McNish stated "I guess I'm in trouble for what I did." [*Id*. at 684-688]. Deputy Foster also testified that, in response to McNish's statement, "I told him to shut up, I didn't want to talk to someone that beat women." [*Id*. at 689]. McNish then "shut up at that time there." [*Id*.].

On cross-examination, the defense vigorously questioned Deputy Foster as to why he only realized the significance of McNish's statement some sixteen months after the fact and why he had not come forward with the evidence sooner. [*Id*. at 691-697]. In their attempt

to impeach Deputy Foster's credibility, the defense repeatedly stressed the serious nature of a first degree murder case and that a trained police officer such as Deputy Foster should have realized the importance of McNish's statement. [*Id.*].

After the trial, it came to the attention of the defense that, prior to his employment with the Carter County Sheriff's Department, Deputy Foster had been convicted of several felonies in the State of Louisiana. [Court File No. 74, Amended Petition for Writ of Habeas Corpus, Attachment N, U.S. Dept. of Justice, FBI Identification Division, list of convictions for Walter William Foster identified by fingerprint records]. The defense also learned that Deputy Foster had failed to list those convictions on his employment application to the Carter County Sheriff's Department; in fact in that application Deputy Foster specifically denied having been arrested or charged with any criminal violation. [*Id.*, Attachment O, Employment Application]. McNish avers that this was important impeachment evidence that was not disclosed by the State.

The claim was raised in post-conviction proceedings and the post-conviction trial court found that, although the information concerning Deputy Foster was favorable to the defense and suppressed by the State, the evidence was not material because "[t]here was overwhelming evidence of the petitioner's guilt presented at trial." [Addendum 3, Vol. I, Technical Record of Post-Conviction Proceedings at 186, Findings of Fact and Conclusions of Law, p. 9]. The trial court further found that evidence of Deputy Foster's felonies would have had "little impeachment value" at trial because the deputy had received a full pardon. [*Id.* at 10]. The Tennessee Court of Criminal Appeals affirmed:

In his second issue, Defendant contends the trial court erred by concluding that no *Brady* violation occurred where the State did not disclose evidence that former deputy sheriff Walter William Foster had been convicted of felonies in Louisiana and that Foster had failed to disclose those convictions as required on his application for employment with the sheriff's department, among other documents.

...

We disagree with Defendant's impression of the trial court's decision. First, we find no improper reliance on Foster's pardon by the trial court. Although Defendant correctly argues that the pardon could not have relieved Foster of the legal duty to report his convictions (therefore, the pardon has no effect upon Foster's falsification of his employment application), the trial court appears to have placed greater importance on the practical value of the pardon in the perception of the jury, as it would have been used to rehabilitate Foster at trial.

Second, the trial court's estimation of the practical impact of Foster's convictions, falsification, and pardon were influenced by the significant weight of evidence against Defendant. Though, as the Supreme Court has instructed, the sufficiency of the evidence has no bearing on a test of materiality, the *strength* of the additional convicting evidence is pivotal in our determination of whether the suppressed *Brady* evidence places the case in "such a different light so as to undermine confidence in the verdict." The post-conviction court in the case at bar found the evidence of guilt so overwhelming that consideration of the undisclosed evidence could not undermine its confidence in the outcome of the trial. We agree, and for this reason we affirm the trial court's denial of post-conviction relief on this issue.

*State v. McNish*, 1999 WL 604436 at **11-13 (quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995), internal citation omitted).

**A.      The Tennessee Court of Criminal Appeals misapplied the test for materiality.**

**B.      Materiality of exculpatory evidence in this case.**

McNish argues that, in determining whether the evidence was material, the state courts ignored the issue of whether McNish or Greg Peters murdered Mrs. Smith. McNish also contends that Deputy Foster's testimony as to McNish's inculpatory statement was the only evidence that came close to an admission of guilt on the part of petitioner. McNish further argues that Deputy Foster's testimony was very important in determining whether McNish would testify at trial. McNish, in fact, testified and denied making the statement to Deputy Foster. [Addendum I, Vol. IV, Transcript of the Evidence, volume IX, p. 858]. As noted by the state courts, however, these arguments overlook the overwhelming evidence presented against McNish.

McNish also argues that Deputy Foster had enhanced credibility with the jury because he was put in charge of the jury. Deputy Foster testified, however, during the hearing on the motion to suppress that he had no contact with the jury. [*Id*., Vol. II, volume II, pp. 277-278]. Although he was sworn in to watch the jury, he realized before the jury was even brought in that he would be a witness in the case. [*Id*. at 278]. After speaking with the attorney general, Deputy Foster did not see the jury nor did the jury see him. [*Id.*].

McNish further argues that the pardon of Deputy Foster's Louisiana convictions has no effect on the materiality of the *Brady* violation. He points to the fact that Deputy Foster was fired from his job by the Carter County Sheriff after the Sheriff became aware of the convictions and Deputy Foster's falsification of his employment application. This argument also overlooks the overwhelming evidence against McNish.

It is worth noting that during the post-conviction hearing McNish's trial counsel, Ken Baldwin, testified that he had a "gut feeling" that McNish was the guilty party, as opposed to Greg Peters. [Addendum 3, Vol. II, Transcript of Post-Conviction Hearing, volume I, p. 153.]. That was because McNish had blood splattering on his clothes, he fled the scene, he was caught changing his blood-splattered pants, and he denied any knowledge of the crime when first interviewed by the police. [*Id.* at 152-154]. Mr. Baldwin further opined:

> [T]he evidence against Mr. McNish was much stronger than the evidence against, if you consider the evidence against Mr. Peters to -- as he being a defendant, if you tried to weigh the amount of state's evidence or the evidence that we had against Mr. Peters versus what they had against Mr. McNish the evidence was far greater against Mr. McNish than it was against Mr. Peters.

[*Id.*, Vol. III, volume II, p. 181-182].

### C. Conclusion

Based upon the foregoing, the court finds that the conclusions of the Tennessee state courts that the *Brady* violation was not material were neither contrary to, nor did they involve an unreasonable application of, federal law.

### III. Mr. McNish received the ineffective assistance of counsel during his capital trial in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

In *Strickland v. Washington*, 466 U.S. 668 (1984) the Supreme Court established a two-part standard for evaluating claims of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance

> prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687.

To establish that his attorney was not performing "within the range of competence demanded of attorneys in criminal cases," *McMann v. Richardson*, 397 U.S. 759, 771 (1970), McNish must demonstrate that the attorney's representation "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. at 687-88. In judging an attorney's conduct, a court should consider all the circumstances and facts of the particular case. *Id.* at 690. Additionally, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). A finding of serious attorney incompetence will not justify setting aside a conviction, however, absent prejudice to the defendant so as to render the conviction unreliable. *Id.* at 691-92.

The issue is whether counsel's performance "was so manifestly ineffective that defeat was snatched from the hands of probable victory." *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992) (*en banc*). In addition, the court should not focus only upon "outcome determination.

> Thus, an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective. To set aside a conviction or sentence solely because

the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him.

*Lockhart v. Fretwell*, 506 U.S. 364, 369-70 (1993).

This court has reviewed the entire record of McNish's post-conviction proceedings. [Addendum 3]. The factual findings of the state courts set forth below are supported in the record. In addition, the Tennessee Court of Criminal Appeals noted that the standard for evaluating claims of ineffective assistance of counsel was established in *Strickland v. Washington*. *McNish v. State*, 1999 WL 604436 at *16. With the foregoing principles in mind, the court will consider McNish's claims of ineffective assistance of counsel.

### A. Ineffective assistance of counsel at the guilt phase.

McNish alleges four instances of ineffective assistance of counsel at the guilt phase, with several having numerous subparts.

### 1. Failure to identify and request forensic experts.

McNish alleges that counsel should have identified the need for and obtained funding to hire expert criminologists and blood spatter experts. McNish first contends that an expert could have established that Ms. Smith was attacked by a right-handed person, which would have been consistent with McNish's version of the incident and inconsistent with Greg Peters' version. The Tennessee Court of Criminal Appeals rejected this argument:

> At the post-conviction evidentiary hearing, Defendant's trial counsel testified that he had neither recollection of nor explanation for the failure to explore a theory that the blows to the victim could not have been administered by a left-handed person (Defendant), but must have been delivered only by a right-handed person (Greg Peters). Defendant contends that this evidence

could have exculpated him at trial, had his counsel secured an expert to show that the victim's assailant could not have been left-handed.

Had Defendant's trial counsel been able to show that a left-handed person could never have inflicted the victim's injuries, of course, the outcome of the trial could have been different. However, without more than an assertion that an expert could have shown that a left-handed person could not have delivered the blows, we are constrained to hold that Defendant has not shown (and we believe cannot show) either that counsel fell below the standard of care for a criminal defense attorney or that there exists a reasonable probability of a different result.

*McNish v. State*, 1999 WL 604436 at *17.

The decision by the Tennessee Court of Criminal Appeals was neither contrary to, nor did it involve an unreasonable application of, federal law. McNish's argument ignores the fact that, while he may be left-handed, he could have used his right hand to strike Mrs. Smith or he may have stood behind her or beside her and used his left hand.

McNish also contends that an expert could have explained McNish's conduct before, during, and after the murder, and thus rebutted the prosecution's argument that his conduct was consistent with guilt. McNish raised this issue in his second amended petition for post-conviction relief. [Addendum 3, Vol. 1, Technical Record of Post-Conviction Proceedings at 86, Second Amended Petition, p. 16]. McNish framed the issue to be that the services of a psychiatrist could have explained his history of blackouts and his loss of memory of the events on the night of the murder. The Tennessee Court of Criminal Appeals considered and rejected the claim in its consideration of the claim that counsel was ineffective during sentencing:

[Defendant] argues that counsel should have requested psychological experts to investigate and testify regarding his extensive history of poor mental health and substance abuse....  We affirm the decision of the post-conviction judge, who stated,

> Petitioner's trial attorneys testified that they chose not to pursue a mental defense at sentencing because it did not mesh with the petitioner's defense that Greg Peters was the assailant and because much of the petitioner's psychological history revealed negative aspects of his character that the prosecutor could capitalize on if mental capacity was put at issue. His trial attorneys also stated that any history of blackouts that the petitioner may have experienced had absolutely nothing to do with this case. A review of the exhibits relating to the petitioner's mental history reveals that the petitioner suffered from long term drug abuse. There is also an escalating pattern of anger control problems noted in the psychological history. Besides the negative aspects of the escalating anger control problems, the reports all state a negative prognosis due to the petitioner's unwillingness to undergo a proper course of treatment. Furthermore, after a thorough review of the overwhelming evidence presented at trial, the court notes that the petitioner testified extensively regarding the events leading up to the victim's death. Thus, the trial court agrees with trial counsel that any history of blackouts that the petitioner may have experienced had very little, if anything, to do with the events relating to this offense. Quite simply, the court concludes that the petitioner has failed to meet his burden of proof with respect to these allegations by his failure to show how he was prejudiced by any of counsel's acts or omissions.

*McNish v. State*, 1999 WL 604436 at *19.

The decision by the Tennessee Court of Criminal Appeals was neither contrary to, nor did it involve an unreasonable application of, federal law.  Evidence of McNish's blackouts and memory loss would have been inconsistent with his testimony as to the manner in which

events unfolded. Counsel's decision to not pursue McNish's mental issues was a matter of trial strategy which this court will not second-guess.

Finally, McNish contends that an expert could have assisted with the motion to suppress McNish's statement to Captain Bowers by showing that the statement was not voluntarily and knowingly given. The Tennessee Court of Criminal Appeals rejected this issue in its consideration of McNish's claim that trial counsel failed to adequately move to suppress his statement.

> In his next issue, Defendant argues that trial counsel were ineffective by failing to adequately move to suppress the statement Defendant made to officers on the night of his arrest. He argues that counsel should have investigated and presented evidence to show that he was too intoxicated or impaired by drugs to have given the statement knowingly and voluntarily.

> The State responds by noting that the Tennessee Supreme Court affirmed the voluntary nature of Defendant's statement in *McNish*, 727 S.W.2d at 496. In that opinion, the court stated,

>> The trial judge conducted a suppression hearing and found that the statement was voluntarily and freely given after appellant had been fully advised of his rights and had signed a written waiver. The evidence supports the findings of the trial judge and certainly does not establish the contention of the appellant that he was so intoxicated from drugs at that time as to be incapable of realizing the consequences of his statement.

> *Id*. Furthermore, the State points out that Defendant's testimony at trial indicated he had a clear, coherent, and comprehensive memory of the events on the evening of the murder. The State argues that one may infer from the detailed nature of the testimony that Defendant waived his right to counsel and right to remain silent knowingly and voluntarily, without impairment by the narcotics in his system.

> We find that Defendant has not shown by a preponderance of the evidence how he was prejudiced by counsel's failure to further investigate his

degree of intoxication when he delivered the statement to officers. Assuming that such failure constituted deficient representation, and further assuming that trial counsel were able to procure suppression of the statement, Defendant has not shown the reasonable probability of a different result at trial. This issue lacks merit.

*McNish v. State*, 1999 WL 604436 at **18-19.

The decision by the Tennessee Court of Criminal Appeals was neither contrary to, nor did it involve an unreasonable application of, federal law. Again, this was a matter of trial strategy which this court will not second-guess.

The Tennessee Court of Criminal Appeals also considered and rejected McNish's claim that counsel should have procured the services of a "blood spatter" expert:

> Defendant's trial counsel also testified that they did not investigate the blood splatters on Defendant's clothing in an attempt to detract attention from their existence. We believe this was a legitimate trial strategy outside the scope of proper review by this Court. The evidence at trial showed that Defendant's pants had blood "splattered" on them, while Peters' shirt was "smeared" with blood. It is within common knowledge that a splatter bloodstain would occur from blood spurting at some force, while a blood smear would arise from contact with a bloody surface. In this way, the splatter pattern on Defendant's pants versus Peters' smeared shirt supports the State's theory of the case-that Defendant inflicted the wounds and Peters attempted to assist the victim in the aftermath of the attack. Therefore, trial counsel's decision to forego investigation of the resulting bloodstains did not constitute deficient performance.

*McNish v. State*, 1999 WL 604436 at *17.

The decision by the Tennessee Court of Criminal Appeals was neither contrary to, nor did it involve an unreasonable application of, federal law. Again, this was a matter of trial strategy. As trial attorney Ken Baldwin testified during the post-conviction hearing,

The blood that my client had on his shirt were little pinpoint blood spatters. My recollection is that the state was not exploiting the blood spatter pattern very much. I thought that they would really hammer about that – and, they didn't. To my mind the – the state really wasn't saying much about the fact that on the defendant's, I think, trousers he had what you would have to say would be a classical blood spatter pattern upon his clothes; and, there wasn't being much brought out about that. And, of course, that made sense from the type of blow that Miss Smith had received. She had been hit over the head and – numerous times with a bud vase which would to me have caused that kind of spattering effect. And, Greg Peters had some smears on him. So, I was just kind of wanting to stay away from that because I thought it might tune the state in to bring out the fact more forcefully than they were doing concerning the – the defendant's pants and clothes.

[Addendum 3, Vol. II, Transcript of Post-Conviction Hearing, volume 1, pp. 117-18].

## 2. Failure to adequately investigate, develop, and present evidence.

McNish alleges that trial counsel failed to properly investigate the case and thus overlooked significant evidence of McNish's innocence. He first refers to the left-hand/right-hand defense that he claims counsel should have pursued. As noted, *supra*, the Tennessee Court of Criminal Appeals rejected this claim and the decision was neither contrary to, nor did it involve an unreasonable application of, federal law.

McNish next alleges that counsel failed to investigate and impeach Greg Peters. According to McNish, counsel should have cross-examined Mr. Peters on the fact that Mr. Peters was right-handed while McNish was left-handed. The Tennessee Court of Criminal Appeals acknowledged "that the credibility of Peters was crucial to Defendant's case." *McNish v. State*, 1999 WL 604436 at *17. The appellate court, however, found "nothing in the record tending to show that there is a reasonable probability that had counsel shown Peters is right-handed, the jury would have had reasonable doubt about Defendant's guilt."

*Id.* For the reasons previously stated, this decision was neither contrary to, nor did it involve an unreasonable application of, federal law.

McNish further claims that counsel failed to develop the inconsistencies between Mr. Peters' account of what occurred in the victim's apartment and Frank Garland's account of what occurred there. McNish claims that Mr. Peters testified that the victim was conscious when he arrived in the apartment but that Mr. Garland testified that she was not responsive when he entered the apartment. This argument, however, ignores the fact that Mr. Peters was in the apartment prior to Mr. Garland's arrival there.

McNish also claims that counsel should have presented evidence that the victim was not robbed. The Tennessee Court of Criminal Appeals considered and rejected this claim.

> Next, Defendant argues that counsel were ineffective for failing "to investigate and present evidence that no robbery had occurred, in spite of the fact that the State's theory involved a robbery-murder." According to Defendant, his trial counsel "should have presented evidence that [Defendant] had no money when he was arrested," "should have pursued questions establishing that Greg Peters had not been searched to determine if he had money," and "should have interviewed and presented Ms. [Louise] McNeil as a witness regarding the fact that she found the victim's purse at the crime scene...."

> Again, conscientious decisions regarding investigation, development, and direct and cross-examination are best considered judgments of trial strategy within the discretion of counsel and not subject to the scrutiny of hindsight. Furthermore, we cannot conclude there is a reasonable probability that had the jury known the victim's purse was found in her bedroom closet and Defendant possessed no money when he was arrested, it would have had reasonable doubt whether Defendant killed the victim....

*McNish v. State*, 1999 WL 604436 at *18.

Given the overwhelming evidence against McNish, as well as the deference given to counsel's trial strategy, the court cannot disagree with the appellate court. The decision by the Tennessee Court of Criminal Appeals was neither contrary to, nor did it involve an unreasonable application of, federal law.

McNish next alleges that counsel failed to develop the absence of evidence of premeditation. The respondent avers that McNish has procedurally defaulted this claim and the court agrees. To the extent petitioner may, as he claims, have raised this issue in his second amended post-conviction petition [Addendum 3, Vol. I, Technical Record of Post-Conviction Proceedings at 71, Second Amended Petition], he did not include the issue on appeal to the Tennessee Court of Criminal Appeals. [Addendum 8, Vol. 1, Doc. 8A, Brief of the Appellant]. Accordingly, the claim has been procedurally defaulted.

McNish further alleges that counsel failed to develop Frank Garland's testimony that twenty seconds lapsed between the time he heard noise in Mrs. Smith's apartment and the time he heard Greg Peters yelling. This claim was properly raised in and was considered by the Tennessee Court of Criminal Appeals.

> [Defendant] claims that defense counsel should have investigated and further developed testimony given at the post-conviction evidentiary hearing by the victim's neighbor, Frank Garland, that twenty seconds lapsed between the time he heard a commotion in the victim's apartment and the time he heard Greg Peters call for help.

*McNish v. State*, 1999 WL 604436 at *18. The appellate court, however, could not find "that the testimony presented by Garland would have had such an effect upon Greg Peters' credibility so as to create reasonable doubt. The evidence at trial strongly indicated

Defendant's guilt, as noted by the post-conviction court in its Findings of Fact and Conclusions of Law." *Id.*

This court agrees with the finding of the appellate court. The decision by the Tennessee Court of Criminal Appeals was neither contrary to, nor did it involve an unreasonable application of, federal law.

McNish also alleges that counsel failed to develop the testimony of Louise McNeil, failed to present evidence corroborating Mr. McNish's broken nose, and failed to present evidence corroborating Mr. McNish's headaches. The respondent avers, and this court agrees, that these claims were procedurally defaulted because they were not raised on appeal to the Tennessee Court of Criminal Appeals. [Addendum 8, Vol. 1, Doc. 8A, Brief of the Appellant].

### 3. Failure to know relevant law.

McNish alleges that counsel was not aware of persuasive Tennessee law and thus failed to properly argue for exclusion of Deputy Foster's testimony regarding McNish's inculpatory statement to him. McNish also claims counsel should have asked for a continuance when confronted with the testimony. On direct appeal, however, the Tennessee Supreme Court found that McNish's statement was not subject to discovery and that Deputy Foster's testimony was properly admitted. *State v. McNish*, 727 S.W. 2d at 496.

> The statement of appellant to the county deputy while he was being transported to police headquarters, referred to previously in reviewing the evidence in this case, is challenged on several grounds. It is insisted that appellant gave the statement without proper warning and that the State failed to disclose the statement to counsel for appellant upon request for discovery.

The evidence clearly showed that the statement was spontaneous and voluntary, and not elicited as a result of any interrogation or suggestion by the deputy, who had not otherwise been involved in the investigation of the case and knew none of the details. He was employed by Carter County, not by the City of Elizabethton, and merely transported appellant to the municipal police headquarters at the request of another officer.

Since the statement was not made in response to interrogation by the deputy, it was technically not discoverable under Rule 16(a)(1)(A), T.R.Crim.P., nor was it in fact even known by the prosecuting authorities until shortly before the trial when the deputy recalled the incident and reported it to the District Attorney. Counsel for appellant were advised of the statement promptly, and we find no error with respect to its admission.

*Id.*

For that reasons, and because the Tennessee Court of Criminal Appeals had determined that the statement was not material under *Brady*, the appellate court concluded: "[W]e find no prejudice to Defendant. Furthermore, we find no prejudice in counsel's failure to secure a continuance upon learning of the new information; Defendant has not proposed to the Court how a continuance would have created a reasonable probability of a different result." *McNish v. State*, 1999 WL 604436 at *18.

The decision by the Tennessee Court of Criminal Appeals was neither contrary to, nor did it involve an unreasonable application of, federal law. Prior to Deputy Foster's trial testimony, and after giving trial counsel the opportunity to research the issue, the court held a hearing on the motion to suppress McNish's statement. [Addendum I, Transcript of the Evidence, Vol. III, volume VI, pp. 644-647 & volume VII, pp. 648-682]. Counsel argued vigorously but unsuccessfully against the admission of the statement.

**4. Failure to adequately move to suppress petitioner's statement.**

This issue refers to McNish's statement to Captain Bowers. McNish alleges that, during the motion to suppress, counsel failed to present evidence of the extent of his intoxication at the time of the statement. The Tennessee Supreme Court affirmed the voluntariness of McNish's statement.

> The trial judge conducted a suppression hearing and found that the statement was voluntarily and freely given after appellant had been fully advised of his rights and had signed a written waiver. The evidence supports the findings of the trial judge and certainly does not establish the contention of appellant that he was so intoxicated from drugs at that time as to be incapable of realizing the consequences of his statement.

*State v. McNish*, 727 S.W. 2d at 496.

The Tennessee Court of Criminal Appeals, on appeal from the denial of post-conviction relief, considered and rejected this claim of ineffective assistance of counsel. The appellate court did so based upon the holding of the Tennessee Supreme Court and the fact that McNish's "testimony at trial indicated he had a clear, coherent, and comprehensive memory of the events on the evening of the murder." *McNish v. State*, 1999 WL 604436 at *19. Thus, the court found that McNish had "not shown by a preponderance of the evidence how he was prejudiced by counsel's failure to further investigate his degree of intoxication when he delivered the statement to officers." *Id*.

The decision by the Tennessee Court of Criminal Appeals was neither contrary to, nor did it involve an unreasonable application of, federal law. As noted, the trial court held a hearing on the motion to suppress McNish's statement to Captain Bowers. [Addendum 1,

Transcript of the Evidence, Vol. I, volume II, pp. 101-205; Vol. II, volume III, pp. 206-303; & volume IV, pp. 304-320].  Trial counsel presented several witnesses to the fact and extent of McNish's intoxication on the day of the murder.

### B.     Ineffective assistance at the sentencing phase of the trial.

McNish alleges four instances of ineffective assistance of counsel at the penalty phase.

### 1.  Failure to Adequately Investigate.

McNish alleges that trial counsel failed to investigate and present a competent mitigation case during sentencing.  He specifically alleges that counsel failed to request and review his medical, military, and school records, and failed to interview members of his family and other people from McNish's past.

Failure to present mitigating evidence at sentencing generally constitutes ineffective assistance of counsel.  *See, e.g., Williams v. Taylor*, 529 U.S. 362, 393 (2000) ("[I]t is undisputed that Williams had a right - indeed, a constitutionally protected right - to provide the jury with the mitigating evidence that his trial counsel either failed to discover or failed to offer."); *Skaggs v. Parker*, 235 F.3d 261, 269 (6th Cir. 2000) ("We find that Skaggs's counsel acted below an objective standard of reasonableness at sentencing, essentially providing no legitimate mitigating evidence on Skaggs's behalf, and that this failure severely undermines our confidence in the just outcome of this proceedings."); *Mapes v. Coyle*, 171 F.3d 408, 426 (6th Cir. 1999) ("[W]hen a client faces the prospect of being put to death

unless counsel obtains and presents something in mitigation, minimal standards require some investigation."); *Austin v. Bell*, 126 F.3d 843, 848 (6th Cir. 1997) (The failure of trial counsel "to investigate and present any mitigating evidence during the sentencing phase so undermined the adversarial process that Austin's death sentence was not reliable.").

The only evidence that the prosecution presented during the penalty phase was the testimony of Roger Deal, a detective sergeant with the Elizabethton Police Department. [Addendum I, Transcript of the Evidence, Vol. IV, volume XI, p. 1038]. Detective Deal testified that he was sent to the Johnson City Medical Center to take a statement from Mrs. Smith, if possible, and if not to take photographs of her injuries. [*Id*. at 1039]. When he arrived at the medical center, Mrs. Smith was dead. [*Id*.]. Detective Deal called a local newspaper photographer, who came to the medical center and photographed Mrs. Smith's body in the detective's presence. [*Id*. at 1040]. Detective Deal verified that four photographs, which were made Exhibits 29, 30, 31, and 32 to his testimony, accurately reflected the condition of Mrs. Smith's body. [*Id*.]. The photographs are included in the record of this case. [*Id*., Vol. V, volume XI, pp. 1191-1194].

McNish's evidence consisted of the testimony of his father, his mother, his niece, his ex-wife, and a friend. He also testified on his own behalf.

McNish's father, George McNish, testified that his son had always been a good boy, helpful to others, had never been in trouble with the law, and had a good, peaceful nature. [*Id*., Vol. IV, volume IV, pp. 1041-1043]. McNish's niece, Teresa Williams, testified that she was very close to her uncle, and that he was a kind, loving person who was always good to

46

everybody and tried to help them with their problems. [*Id*. at 1054-1056]. McNish's ex-wife, Janie Bradley, testified that she had remained close to him since their divorce; that McNish was a tender, compassionate, good-hearted person; that she had never known him to be violent; and that the McNish she knew and loved was not capable of the fatal assault on Mrs. Smith. [*Id*., Vol. V, volume XII, pp. 1060-1066].

McNish testified on his own behalf that he wanted to live because he loved life and loved his family and his friends. [*Id*. at 1066-1067]. McNish's friend, Bo Nave, testified that he knew McNish well. [*Id*. at 1077]. Mr. Nave testified that McNish helped people, that he was compassionate and courteous, and was not known to be violent. [*Id*. at 1078-1079]. McNish's mother, Pauline McNish, testified that "no mother could ask for any finer son." [*Id*. at 1088]. She also testified that McNish was good hearted and without a violent bone in his body. [*Id*. at 1088-1090].

In his amended petition for the writ of habeas corpus, McNish details a lengthy family history which includes poverty; physical, mental, and sexual abuse; and alcoholism and drug addiction. [Court File No. 74, Amended Petition, pp. 70-80]. A review of McNish's petitions for post-conviction relief reveals that he did not raise the issue of his family history in the state courts.

In his original petition, McNish merely alleged that his attorneys "failed to adequately investigate the background and personal and medical history of Petitioner for the existence of mitigating evidence ...." [Addendum 3, Vol. I, Technical Record of Post-Conviction Proceedings at 3, Petition for Post-Conviction Relief, p. 2]. His amended petition made no

mention of mitigation evidence. [*Id*. at 32, Amended Petition, pp. 1-3]. His second amended petition gave a very brief personal history, with no mention of poverty or abuse. [*Id*. at 71, Second Amended Petition, p. 3]. That petition also merely alleged that trial counsel failed to "identify and present all available mitigating evidence." [*Id*., p. 20]. His third amended petition simply restated the second amended petition as to mitigating evidence. [*Id*. at 96, Third Amended Petition, pp. 3, 20].

Attorney Ann Short testified at the post-conviction evidentiary hearing as an expert on attorney competence in death penalty cases. [Addendum 3, Vol. IV, Transcript of Post-Conviction Hearing on January 14, 1997, p. 10]. With respect to mitigation evidence, Ms. Short simply testified that trial counsel must make a complete investigation of the defendant's background to present a complete picture of the individual. [*Id*. at 65-66].

During the post-conviction hearing McNish's trial counsel, Ken Baldwin, was asked why he did not seek "some type of psychiatric evidence available to present to the jury in a sentencing phase in this case?" [Addendum 3, Vol. II, Transcript of Post-Conviction Hearing, volume I, pp. 135-136.]. He was not questioned about his failure to pursue McNish's family history. Accordingly, to the extent McNish alleges that counsel was ineffective in failing to present to the jury during the penalty phase the family history detailed in the amended habeas petition, he has procedurally defaulted that claim.

With respect to the claim that trial counsel failed to investigate mitigating circumstances, the Tennessee Court of Criminal Appeals agreed with the trial court that McNish failed to demonstrate ineffective assistance of counsel. McNish presented mitigating

48

evidence from his family and friends, each of whom testified that he was basically a kind, compassionate man. Unfortunately for McNish, on cross-examination, all the State's attorney had to do was simply show the witness a photograph of Mrs. Smith's badly beaten body and ask whether a kind, compassionate man would do such a thing to an elderly woman.

> Our circuit's precedent has distinguished between counsel's *complete* failure to conduct a mitigation investigation, where we are likely to find deficient performance, and counsel's failure to conduct an *adequate* investigation, where the presumption of reasonable performance is more difficult to overcome:

> > [T]he cases where this court has granted the writ for failure of counsel to investigate potential mitigating evidence have been limited to those situations in which defense counsel have *totally* failed to conduct such an investigation. In contrast, if a habeas claim does not involve a failure to investigate but, rather, petitioner's dissatisfaction with the *degree* of his attorney's investigation, the presumption of reasonableness imposed by *Strickland* will be hard to overcome.

*Beuke v. Houk*, 537 F.3d 618, 643 (6th Cir. 2008) (quoting *Campbell v. Coyle*, 260 F.3d 531, 552 (6th Cir.2001) (emphasis added)).

Because McNish's defense attorneys chose to use testimony from his family and friends in support of mitigation, counsel did not *totally* fail to conduct a mitigation investigation, and McNish has not shown that the proceedings would have resulted in a different outcome had counsel done a more thorough mitigation investigation. Accordingly, McNish has failed to demonstrate ineffective assistance of counsel in this regard and the decision by the Tennessee Court of Criminal Appeals was neither contrary to, nor did it

involve an unreasonable application of, federal law. As the Sixth Circuit noted in *West v. Bell*, 550 F.3d 542 (6th Cir. 2008), another death penalty case from this district:

> Finally, we note that even if West could prove that his counsel was ineffective for all of the reasons he cited, he has not shown that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." West's trial counsel attempted to appeal to the jury's sympathy, decency, and common sense. They attempted to show that West had been a good and decent citizen: that he had never before been in trouble with the law, that he was a veteran who served his country, and that he was a loving husband and a soon-to-be father. The jury was not persuaded. We are not convinced that the school, military, and employment records that West now argues should have been submitted would have affected the jury's verdict.

> As for the evidence of the past abuse, it is possible that had West's attorneys discovered it, they might have taken the alternative approach of portraying West as the product of an unstable and abusive home. The jury might have believed that the abuse made West the kind of person who was psychologically unable to confront or disobey strong, threatening people such as Martin. The jury might have pitied West and chosen to spare his life. However, the very same evidence may have had the opposite effect on the jury. They might have believed that violence begets violence and that West's past abuse made him the kind of person who could have raped and tortured a fifteen year-old girl. They might have despised West and sentenced him to death with greater zeal.

> It is not enough for this court to speculate that the jury would have chosen the former path. There must be "a reasonable probability" that the proceeding would have been different. Given the strength of the evidence against West presented at trial and the weakness of the mitigating evidence that West presented during the post-conviction proceedings, we cannot conclude that there was reasonable probability that the jury would have chosen to spare West's life.

*Id*. at 556 (quoting *Strickland*, 466 U.S. at 694).

## 2. Failure to identify and request mitigation experts.

McNish alleges that trial counsel failed to identify and request funds for medical and psychological experts who could testify as to his substance abuse and mental health history. The Tennessee Court of Criminal Appeals considered and rejected this claim.

> Defendant contends that his trial counsel breached the standard of care of attorneys in capital criminal cases to his prejudice by failing to adequately investigate and present mitigation testimony in the sentencing phase of his trial. He argues that counsel should have requested psychological experts to investigate and testify regarding his extensive history of poor mental health and substance abuse. He maintains that because of the aforementioned "rush" to the post-conviction hearing in this case, post-conviction counsel did not have time to adequately locate and present this evidence. *See supra* Part I. We affirm the decision of the post-conviction judge, who stated,

>> Petitioner's trial attorneys testified that they chose not to pursue a mental defense at sentencing because it did not mesh with the petitioner's defense that Greg Peters was the assailant and because much of the petitioner's psychological history revealed negative aspects of his character that the prosecutor could capitalize on if mental capacity was put at issue. His trial attorneys also stated that any history of blackouts that the petitioner may have experienced had absolutely nothing to do with this case. A review of the exhibits relating to the petitioner's mental history reveals that the petitioner suffered from long term drug abuse. There is also an escalating pattern of anger control problems noted in the psychological history. Besides the negative aspects of the escalating anger control problems, the reports all state a negative prognosis due to the petitioner's unwillingness to undergo a proper course of treatment. Furthermore, after a thorough review of the overwhelming evidence presented at trial, the court notes that the petitioner testified extensively regarding the events leading up to the victim's death. Thus, the trial court agrees with trial counsel that any history of blackouts that the petitioner may have experienced had very little, if anything, to do with the events relating to this offense. Quite simply, the court concludes that the petitioner has failed to meet his burden of proof with

> respect to these allegations by his failure to show how he was
> prejudiced by any of counsel's acts or omissions.

We agree entirely with the post-conviction court's exhaustive and comprehensive review of this issue. This issue lacks merit.

*McNish v. State*, 1999 WL 604436 at *19.

The decision by the Tennessee Court of Criminal Appeals was neither contrary to, nor did it involve an unreasonable application of, federal law. As this court noted previously, evidence of McNish's blackouts and memory loss would have been inconsistent with his testimony as to the manner in which events unfolded. Counsel's decision to not pursue McNish's mental issues was a matter of trial strategy which this court will not second-guess.

**3. Failure to know relevant law**.

McNish alleges that trial counsel told the jury that McNish had to prove mitigating circumstances beyond a reasonable doubt. McNish did not raise this claim in the state courts and the claim is procedurally defaulted.

**4. Failure to raise claims**.

McNish alleges that trial and appellate counsel were ineffective in failing to present to the state courts the claims raised in this habeas corpus petition. This claim is procedurally defaulted as well.

> **C.** **The state court decision denying petitioner's claim of ineffective assistance of counsel is contrary to or an unreasonable application of federal law or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented as it relied upon the wrong standard in**

**judging whether there was prejudice for counsels' ineffectiveness.**

McNish alleges that the post-conviction court used the wrong standard with regard to its duty to consider the request for expert services to show ineffective assistance of counsel. The court has already rejected that claim. *See* section I., B. *supra*.

McNish also alleges that the post-conviction court used the wrong standard in considering the claim of ineffective assistance of counsel. According to McNish, the court used an "outcome-determinative" test for prejudice with respect to the claim that counsel failed to investigate and develop a reasonable trial strategy.

He first refers to the post-conviction court's statement that "[i]f the petitioner fails to prove by a preponderance of the evidence that the result would have been different had counsel acted differently, i.e., the prejudice prong, it is unnecessary to address the competency of counsel prong." [Addendum 3, Vol. 1, Technical Record of Post-Conviction Proceedings at 186, Findings of Fact and Conclusions of Law, p. 3 ]. He next refers to the court's conclusion "that the petitioner has failed to show how he was prejudiced by" the failure to develop a reasonable trial strategy because of the "overwhelming evidence of guilty apparent from the record." [*Id*. at 3-4].

The Tennessee Court of Criminal Appeals considered and rejected this claim.

Finally, Defendant asserts that the post-conviction judge used an improper standard to determine whether his trial counsel had been ineffective by relying on an outcome- or result-determinative test for prejudice. As the State notes, the trial court recited in its Findings of Fact and Conclusions of Law in this case,

In order to be granted relief on the grounds of ineffective assistance of counsel, the petitioner must establish that the advice given or the services rendered were not within the range of competence demanded of attorneys in criminal cases and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

(Quoting *Strickland v. Washington*, 466 U.S. 668, 693, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). Thus, we conclude that the trial court knew and applied the proper standard to determine whether Defendant suffered the ineffective assistance of counsel.

As our Supreme Court stated in *Henly v. State*, 960 S.W.2d 572, 580 (Tenn.1997),

Because a petitioner must establish both prongs of the test to prevail on a claim of ineffective assistance of counsel, failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim. Indeed, a court need not address the components in any particular order or even address both if the defendant makes an insufficient showing of one component. *Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069; *Goad*, 938 S.W.2d at 370.

*McNish v. State*, 1999 WL 604436 at *20.

The decision by the Tennessee Court of Criminal Appeals was neither contrary to, nor did it involve an unreasonable application of, federal law. The state courts relied on the standard set forth in *Strickland*. *See Williams v. Taylor*, 529 U.S. 362 (2000).

To establish ineffectiveness, a "defendant must show that counsel's representation fell below an objective standard of reasonableness. To establish prejudice he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."

*Id*. at 390-91 (quoting *Strickland*, 466 U.S. at 688, 694).

**IV.     The "heinous, atrocious or cruel" aggravating factor used in this case violates Mr. McNish's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

McNish contends that the trial court's instruction on the heinous, atrocious and cruel (HAC) aggravator, as set forth in Tenn. Code Ann. § 39-2-203(i)(5) (repealed), violated his constitutional rights.  During the penalty phase of the trial, the trial court instructed the jury as follows:

> No death penalty shall be imposed unless you find unanimously that one or more of the following specified statutory aggravating circumstances has been proven on the trial and/or on the sentencing hearing beyond a reasonable doubt.
>
> (1)     The murder was especially heinous, atrocious, or cruel in that it involved torture of depravity of mind.[6]
>
> (2)     The murder was committed while the defendant was engaged in committing, or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, larceny, kidnapping, aircraft piracy, or unlawful throwing, placing or discharging of a destruct device or bomb.

[Addendum I, Transcript of the Evidence, Vol. V, volume XII, pp. 1135-1136].  The court did not define the terms heinous, atrocious, or cruel.  The court then instructed the jury on mitigating circumstances.  [*Id.* at 1136].  The court next instructed: "If the jury unanimously determines that at least one statutory aggravating circumstance or several statutory

---

[6]Tennessee law now provides the following HAC aggravator: "The murder was especially heinous, atrocious, or cruel, in that it involved torture or serious physical abuse beyond that necessary to produce death."  Tenn. Code Ann. § 39-13-204(i)(5).

aggravating circumstances have been proved by the State beyond a reasonable doubt, and said circumstance or circumstances are not outweighed by any sufficiently substantial mitigating circumstances, the sentence shall be death." [*Id*. at 1137].

The jury found as an aggravating circumstance that "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind." [*Id*. at 1150]. The jury did not find the other aggravating circumstance argued by the State, which was that the murder was committed during an attempted robbery.

McNish relies on *Maynard v. Cartwright*, 486 U.S. 356 (1988), to support his argument that use of the HAC aggravating circumstance violated his constitutional rights. In *Maynard*, the Supreme Court held that Oklahoma's statutory aggravating circumstance that the murder was "especially heinous, atrocious, or cruel," without more, was unconstitutionally vague because it failed to furnish guidance to the jury in choosing between death and a lesser penalty. *Id*. at 363-64. The Court noted with approval, however, that a state court could restrict the HAC aggravator to murders "in which torture or serious physical abuse is present." *Id*. at 365.

Prior to *Maynard*, the Tennessee Supreme Court had narrowed the HAC aggravator by setting forth definitions of heinous, atrocious, cruel, torture, and depravity of mind:

> Our statute provides that it is *the murder* which must be *especially* heinous, atrocious, or cruel. The second clause of this statutory provision, *viz.*, "... in that it involved torture or depravity of mind," qualifies, limits and restricts the preceding words "especially heinous, atrocious or cruel." This second clause means that to show that the murder was especially heinous, atrocious or cruel the State must prove that it involved torture of the victim or depravity of mind of the killer.

56

"Torture" means the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious. In proving that such torture occurred, the State, necessarily, also proves that the murder involved depravity of mind of the murderer, because the state of mind of one who willfully inflicts such severe physical or mental pain on the victim is depraved.

However, we hold that "depravity of mind" may, in some circumstances, be shown although torture, as hereinabove defined, did not occur. If acts occurring after the death of the victim are relied upon to show depravity of mind of the murderer, such acts must be shown to have occurred so close to the time of the victim's death, and must have been of such a nature, that the inference can be fairly drawn that the depraved state of mind of the murderer existed at the time the fatal blows were inflicted upon the victim. This is true because it is the murderer's state of mind at the time of the killing which must be shown to have been depraved.

Thus, mutilation of the dead body of the victim may be found to constitute depravity of mind, but only if the mutilation occurred so soon after the death of the victim that the inference may be fairly drawn that the murderer possessed that depravity of mind at the time of the actual killing. If the length of time intervening between the time of death of the victim and the time of mutilation of the body is so great that the inference cannot be fairly drawn that the murderer possessed the depravity of mind at the time the fatal blows were inflicted, then it cannot be said that the murder, itself, involved depravity of mind.

*State v. Williams*, 690 S.W.2d 517, 529-30 (Tenn. 1985)

The Sixth Circuit has found Tennessee's HAC aggravating circumstance to be impermissibly vague on its face. *Houston v. Dutton*, 50 F.3d 381, 383, 387 (6th Cir. 1995). The problem is curable, however, with appropriately narrowing language in the jury instructions, *Coe v. Bell*, 161 F.3d 320, 335 (6th Cir. 1988), or through a narrowing construction of the statutory language by a reviewing court on appeal. *Bell v. Cone*, 543 U.S. 447, 455-60 (2005) (per curiam).

In *Bell v. Cone*, the Supreme Court reversed the Sixth Circuit's grant of habeas corpus relief and held that the Tennessee Supreme Court's affirmance on direct review of the imposition of the death penalty based upon the jury's finding of the HAC aggravator was not contrary to clearly established federal law. *Id*. at 460. In doing so, the Court reviewed prior cases in which the Tennessee Supreme Court had consistently applied the narrowed construction of the HAC aggravator in affirming death sentences. *Id*. at 456-67. The Court then held that the Tennessee Supreme Court is presumed to have applied a narrowing construction of the HAC aggravator in the present case "absent an affirmative indication to the contrary." *Id*. at 456. Any error in the instruction to the jury was thus cured. *Id*. at 455.

> In light of these holdings, we are satisfied that the State's aggravating circumstance, as construed by the Tennessee Supreme Court, ensured that there was a "principled basis" for distinguishing between those cases in which the death penalty was assessed and those cases in which it was not.
>
> In sum, even assuming that the Court of Appeals was correct to conclude that the State's statutory aggravating circumstance was facially vague, the court erred in presuming that the State Supreme Court failed to cure this vagueness by applying a narrowing construction on direct appeal. The state court did apply such a narrowing construction, and that construction satisfied constitutional demands by ensuring that respondent was not sentenced to death in an arbitrary or capricious manner.

*Id*. at 459-60 (quoting *Arave v. Creech*, 507 U.S. 463, 474 (1993)); *see also Sutton v. Bell*, 645 F.3d 752, 760 (6th Cir. 2011) ("The Tennessee Supreme Court reviewed and affirmed the jury's finding of the [HAC] aggravator on direct appeal. Because there is no "affirmative indication to the contrary, we must presume that it" applied its well-established, and permissible, narrowing construction of the aggravator, thereby "cur[ing] any error in the jury

instruction.") (quoting *Bell v. Cone*, 543 U.S. at 453-56); *Payne v. Bell* 418 F.3d 644, 657 (6th Cir. 2005) ("The Tennessee Supreme Court in this case can be presumed to have applied a narrowing construction to the HAC aggravator in its decision upholding Payne's [death] sentence.").

In McNish's case, the Tennessee Supreme Court on direct appeal found "no merit in the insistence of appellant that the evidence was insufficient to show that the murder was especially heinous, atrocious, or cruel and in the contention that it did not show torture or depravity of mind." *State v. McNish*, 727 S.W. 2d at 494 (citing *State v. Williams*, 690 S.W. 2d 517 (Tenn. 1985)). In *Williams*, the Tennessee Supreme Court narrowed the HAC aggravating factor by setting forth detailed definitions of "heinous," "atrocious," "cruel", "torture," and "depravity of mind." 690 S.W. 2d at 529-30. Based upon that, the McNish court stated: "The evidence in the present case shows that the victim was beaten several times and that she remained alive and at least partially conscious throughout her ordeal." 727 S.W. 2d at 494. The Tennessee Supreme Court also noted that "the infliction of heavy, repeated and vicious blows to a helpless but conscious elderly victim may easily be found by a trier of fact to fall in [the category of heinous, atrocious, or cruel].". *Id*. at 495. The Tennessee Supreme Court clearly applied a narrowing construction to the HAC aggravator in upholding McNish's death sentence and thus cured any error in the jury instructions.

In post-conviction proceedings, the Tennessee Court of Criminal Appeals rejected the claim that the HAC aggravator was unconstitutionally vague.

The trial court instructed the jurors that to impose the death penalty, they must find beyond a reasonable doubt that "[t]he murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind." Though the statute no longer contains this form of the aggravator, the Tennessee Supreme Court has many times affirmed its constitutionality and affirmed death sentences based upon its application.

*McNish v. State*, 1999 WL 604436 at 21 (internal citations to the Tennessee Code Annotated omitted; other citations omitted). The decisions by the Tennessee appellate courts were neither contrary to, nor did they involve an unreasonable application of, federal law.

> **V. Use of the HAC aggravating factor in this case failed to place Mr. McNish within a meaningfully narrowed class of defendants eligible for the death penalty because the same facts establish the crime and the aggravating circumstance and the aggravating circumstance adds no culpability beyond that necessary to establish first degree murder in violation of Mr. McNish's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.**

McNish alleges that, because it was the blows to her head that hastened Mrs. Smith's death, those same blows cannot be used to prove the HAC. He relies on *State v. Middlebrooks*, 840 S.W.2d 317 (Tenn. 1992), which was decided after his conviction.

In *Middlebrooks*, the Tennessee Supreme Court considered whether a felony-murder aggravating circumstance could be used when the defendant was convicted of first-degree murder based only upon a felony murder and held that "an aggravating circumstance which merely repeats an element of the underlying crime cannot perform" the function of narrowing those eligible for the death penalty. *Id.* at 346. "It is now a well-known principle that when a defendant is convicted of first degree murder solely on the basis of felony murder, the use of the felony murder aggravating circumstance to support a death sentence, without more,

fails to sufficiently narrow the class of death-eligible offenders." *King v. State*, 989 S.W. 2d 319, 323 (Tenn. 1999) (citing *State v. Middlebrooks*, 840 S.W.2d 317, 346 (Tenn. 1992)).

McNish raised this issue in the state courts in post-conviction proceedings as a matter of state law. [Addendum 8, Vol. 1, Doc. 8A, Brief of the Appellant, pp. 98-99 (arguing that use of the HAC aggravator constituted double-counting under *Middlebrooks*)]. The Tennessee Court of Criminal Appeals considered and rejected the claim.

> [A]pplying the HAC aggravator requires a jury to consider whether the instance of murder has been aggravated by the manner and circumstances surrounding the death -- a distinction assisted by the use of the adverb "especially" and the concept of "torture," which elevate the level of atrocity to a degree beyond the means or method of the murder.

*McNish v. State*, 1999 WL 604436 at *22.

As noted, McNish raised this claim in the state courts solely as a matter of state law. By failing to raise this claim as a matter of federal constitutional law, McNish has procedurally defaulted the claim. *See Gray v. Netherland*, 518 U.S. 152, 162-63 (1996) (in order to exhaust state remedies as to a particular claim, that claim must have been presented to the state courts as a federal constitutional claim). In any event, the claim lacks merits.

It is important to note that *Middlebrooks* was based upon the Tennessee state constitution, not the federal constitution. *See King v. State*, 989 S.W. 2d at 323 n.7 (citations omitted) ("Following *Middlebrooks*, a majority of [the Tennessee Supreme Court] has held that the *Middlebrooks* decision was based independently [of the federal constitution] on Article I, section 16 of the Tennessee Constitution."). Indeed, the federal constitution does not forbid the double-counting that is forbidden by *Middlebrooks*. *See Lowenfield v. Phelps*,

484 U.S. 231 (1988). "[T]he fact that the aggravating circumstance duplicated one of the elements of the crime does not make [defendant's] sentence constitutionally infirm." *Id.* at 246; *see also Coe v. Bell*, 161 F.3d 320, 349-50 (1998) (double-counting under Tennessee's death penalty statute does not violate the federal constitution) (citing *Lowenfield v. Phelps*, 484 U.S. at 241-46).

Based upon the foregoing, the decision by the Tennessee Court of Criminal Appeals was neither contrary to, nor did if involve an unreasonable application of, federal law.

### VI. The trial court's instructions to the jury following the sentencing hearing violated the petitioner's Eighth and Fourteenth Amendment rights under the United States Constitution by impermissibly limiting the jurors' consideration of mitigating evidence.

In this section, despite its title, McNish alleges that the trial court's instructions required the jury to unanimously agree on any given mitigating circumstance. A review of the record reveals that McNish did not raise this issue in the state courts. [Addendum 2, Doc. 2A, Brief of the Appellant on direct appeal; Addendum 8, Vol. 1, Doc. 8A, Brief of the Appellant in post-conviction proceedings]. Accordingly, the claim has been procedurally defaulted.[7]

### VII. There was insufficient evidence of premeditation and cool reflection to support the petitioner's conviction for first degree common law murder particularly in light of the jury's finding that there was

_____

[7]In his motion for summary judgment, respondent stated that this claim was presented to the Tennessee Court. [Court File No. 76, Motion for Summary Judgment, p. 37]. Upon reflection, and in reply to petitioner's response to the motion for summary judgment, respondent states that his previous statement was in error and that the claim has been procedurally defaulted. [Court File No. 120, Reply, p. 32]. Upon a review of the record, the court agrees.

**insufficient evidence to support a felony murder aggravating circumstance.**

McNish alleges the evidence was not sufficient to support a finding by the jury of premeditation. He relies on *State v. Brown*, 836 S.W. 2d 530, 543 (Tenn. 1992), for the proposition that repeated blows alone cannot support a verdict of first-degree murder. It is important to note that *Brown* was decided after McNish's conviction and sentence were upheld by the Tennessee Supreme Court. That court on direct appeal found that the record supported a verdict of first-degree murder.

> The record abundantly supports that verdict. Mrs. Smith was mercilessly beaten to death by repeated blows by an assailant who was obviously much more powerful than she....
>
> There was ample evidence of every element to establish murder in the first degree, including premeditation as demonstrated by the numerous severe and crushing blows inflicted upon the victim."

*State v. McNish*, 727 S.W. 2d at 494. It is also important to note that the Tennessee Supreme Court subsequently held that *Brown* is not retroactive. *Miller v. State*, 54 S.W. 3d 743 (Tenn. 2001). "[W]e conclude that *Brown* did not announce a new state constitutional rule and is not retroactive." *Id*. at 748.

To the extent McNish relies on a violation of state law, his claim "is not cognizable in a federal habeas corpus proceeding." *Spalla v. Foltz*, 788 F.2d 400, 405 (6th Cir. 1986). *See also Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("we reemphasize that it is not the province of a federal habeas court to reexamine state court determinations on state law questions"); *Lewis v. Jeffers*, 497 U.S. 764, 779 (1990) ("federal habeas corpus relief does

not lie for errors of state law"); *Pulley v. Harris*, 465 U.S. 37, 41 (1984) ("A federal court may not issue the writ on the basis of a perceived error of state law."); *Sinistaj v. Burt*, 66 F.3d 804, 807 (6th Cir. 1995) ("Errors of state law alone cannot form the basis of relief under federal habeas corpus."); *Houston v. Dutton*, 50 F.3d 381, 385 (6th Cir. 1995) ("When and how state law applies to a particular case is a matter on which the state supreme court has the last word. No federal issues are implicated and no federal question is presented in determining whether a change in state law is to be applied retroactively.") (citation omitted).

To the extent McNish alleges a violation of due process, his claim lacks merit. In a federal habeas corpus proceeding in which a state prisoner challenges the sufficiency of the evidence supporting his conviction, the petitioner "is entitled to a determination whether the record evidence could support a finding of guilt beyond a reasonable doubt." *Moore v. Duckworth*, 443 U.S. 713, 714 (1979). However, the petitioner is entitled to habeas relief only "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). *See Brofford v. Marshall*, 751 F.2d 845, 856 (6th Cir. 1985).

When reviewing a jury's verdict under a sufficiency of the evidence standard, a court must consider all the evidence in a light most favorable to the prosecution. *Jackson v. Virginia*, 443 U.S. at 319. Witness credibility is an issue to be left solely within the province of the jury, *Deel v. Jago*, 967 F.2d 1079, 1086 (6th Cir. 1992); *United States v. Schultz*, 855 F.2d 1217, 1221 (6th Cir. 1988), and substantial deference should be given to the trier of fact. *United States v. Ayotte*, 741 F.2d 865, 867 (6th Cir. 1984). "[T]he federal court sitting in

habeas should not attempt to substitute its own opinion for that of the jury which convicted the petitioner." *York v. Tate*, 858 F.2d 322, 329 (6th Cir. 1988). A conviction should be affirmed if *any* rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *United States v. Bourjaily*, 781 F.2d 539, 544 (6th Cir. 1986), *aff'd*, 483 U.S. 171 (1987).

This court has reviewed the transcript of McNish's trial [Addendum 1, Transcript of the Evidence, Vols. I-IV, volumes I-XII] and finds the decision by the Tennessee Court of Criminal Appeals is supported in the record. The decision was neither contrary to, nor did it involve an unreasonable application of, federal law.

### VIII. The jury's capital sentencing determination was improperly influenced by extraneous information in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

This allegation refers to the allegation, mentioned in section I.,C. *supra*, that Archie Parlier stated at the post-conviction hearing, in a proffer of testimony, that he was a juror at McNish's trial and during deliberations it came to the jurors' attention from the foreperson that McNish would only serve six to eight years if given a life sentence. [Addendum 3, Vol. II, Transcript of Post-Conviction Hearing, volume I, pp. 30-33].

On appeal from the denial of post-conviction relief, the Tennessee Court of Criminal Appeals considered the exclusion of Mr. Parlier's testimony. The appellate court concluded that the testimony was properly excluded because "the information communicated by the foreperson of the jury in the case at bar constituted an internal influence" and thus did not constitute a ground for overturning a jury verdict. *McNish v. State*, 1999 WL 604436 at *15.

65

This decision by the appellate court was neither contrary to, nor did if involve an unreasonable application of, federal law. *See Tanner v. United States*, 483 U.S. 107 (1987) (evidence of an internal influence on a jury's decision is inadmissible under Rule 606 of the Federal Rules of Evidence).

### IX. Petitioner's involuntary statement was used against him during his capital trial in violation of *Miranda v. Arizona* and the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

This claim refers to McNish's statement to Captain Tom Bowers. McNish alleges the statement was not voluntary because of his intoxication and thus violated his rights under *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The Supreme Court in *Miranda* set forth the procedures for applying the privilege against self-incrimination and the right to counsel in custodial interrogations. The Supreme Court noted that a defendant may waive his rights, "provided the waiver is made voluntarily, knowingly and intelligently." *Id*. at 444.

As discussed previously, the trial court held a hearing on the motion to suppress McNish's statement to Captain Bowers and denied the motion. [Addendum 1, Transcript of the Evidence, Vol. I, volume II, pp. 101-205; Vol. II, volume III, pp. 206-303; & volume IV, pp. 304-320]. The Tennessee Supreme Court on direct appeal affirmed the denial of the motion to suppress.

Counsel also challenged the initial statement given by appellant to investigating officers after he was taken into custody on the evening of April 5, 1983, immediately after the assault on Mrs. Smith. The trial judge conducted a suppression hearing and found that the statement was voluntarily and freely given after appellant had been fully advised of his rights and had signed a written waiver. The evidence supports the findings of the trial judge

and certainly does not establish the contention of appellant that he was so intoxicated from drugs at that time as to be incapable of realizing the consequences of his statement.

*State v. McNish*, 727 S.W. 2d at 496.

McNish contends that the Tennessee Supreme Court used an erroneous standard of review by failing to determine the voluntariness of the statement and instead relying on the fact that McNish was not "so intoxicated from drugs at that time as to be incapable of realizing the consequences of his statement." *Id.*

Captain Bowers testified at the suppression hearing that at the time McNish made his statement "[h]e was obviously under the influence of some drug or intoxicant, but not to the point of being drunk." [Addendum I, Transcript of the Evidence, Vol. I, volume II, p. 114]. He further testified that McNish had no problems as to "his ability to talk to [Captain Bowers] and narrate what had happened." [*Id*. at 115]. Captain Bowers also testified that McNish was able to tell where he had been and to answer "two or three pages worth of questions." [*Id*. at 116].

Detective Mike Peters also testified at the suppression hearing. He was the one who, with another officer, took McNish to the hospital to draw blood. [*Id*. at 148]. He testified that, during his observation of McNish at the police station and the hospital, McNish "looked as if he may have been under the influence of some type of drug, but not incapacitated, not staggering around, or, you know, redness of the eyes, or anything that would indicate a typical type person that would be publicly drunk or anything like that." [*Id*. at 149]. Detective Peters also testified that, with respect to McNish's cooperation with the nurses in

drawing his blood, "[h]e cooperated fine. He understood what I was saying. He followed my instructions very well." [*Id*. at 153].

Deputy Bill Foster, who had transported McNish to the police station after his arrest, also testified at the suppression hearing. [*Id*., Vol. II, volume III, p. 270]. According to Deputy Foster, McNish "walked unaided" to the police car and he did not appear to be under the influence of an intoxicant. [*Id*. at 271, 272]. McNish's girlfriend at the time of his arrest, Selina Welch, also testified that McNish acted normal on the day in question and did not appear to be under the influence of an intoxicant. [*Id*. at 288-291].

The trial court determined that "[c]onsidering all the evidence, the Court is of the opinion and hereby finds that the defendant freely, voluntarily, and knowingly waived his Constitutional rights after being fully advised of his Miranda – of the Miranda warnings; therefore, the motion to suppress is respectfully denied." [*Id*. at 320]. The Tennessee Supreme Court affirmed. *State v. McNish*, 727 S.W. 2d at 496. The decisions by the state courts are supported in the record and were neither contrary to, nor did they involve an unreasonable application of, federal law.

> **X.    The trial court prevented Mr. McNish from presenting evidence of innocence during the guilt phase of his capital trial in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

McNish alleges that he was prevented from presenting proof that Greg Peters was the one who killed Mrs. Smith. Challenges to state evidentiary rulings are generally "not cognizable in a federal habeas corpus proceeding." *Spalla v. Foltz*, 788 F.2d 400, 405 (6th

Cir. 1986). In addition, McNish raised this issue in the state courts only as a matter of state law. [Addendum 2, Doc. 2A, Brief of the Appellant, pp. 54-55 (arguing that the trial court's reliance on state law to limit proof of Greg Peters' violent nature was misplaced)]. Accordingly, by failing to raise this claim as a matter of federal constitutional law, McNish has procedurally defaulted the claim. *See Gray v. Netherland*, 518 U.S. 152, 162-63 (1996) (in order to exhaust state remedies as to a particular claim, that claim must have been presented to the state courts as a federal constitutional claim).

### XI. The jury instructions at the guilt phase in this case violated Mr. McNish's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

#### A. Instruction that premeditation can be formed in an instant.

The trial court instructed the jury that "[a]ny person who willfully, deliberately, maliciously and with premeditation kills another person is guilty of murder in the first degree." [Addendum I, Transcript of the Evidence, Vol. IV, volume XI, p. 1005]. The court defined premeditation as follows:

> This means that the intent to kill must have been formed prior to the act itself. Such intent or design to kill may be conceived and deliberately formed in an instand [sic]. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. It is sufficient that it preceded the act, however short the interval. The mental state of the accused at the time he allegedly instigated the act which resulted in the alleged death of the deceased must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation. Passion does not always reduce the crime below murder in the first degree, since a person may deliberate, may premeditate, and may intend to kill after premeditation and deliberation, although prompted and to a large extent controlled by passion at the time. If the design to kill was formed with

deliberation and premeditation, it is immaterial that the accused may have been in a passion or excited when the design was carried into effect.

[*Id*. at 1006-1007].

McNish alleges the instruction that premeditation can be formed in an instant was unconstitutional. The Tennessee Supreme Court, however, found the instruction valid.

Appellant has challenged the jury instructions on the issue of premeditation. The instructions given were in accordance with a pattern jury instruction currently in use in this state, to the effect that premeditation does not require any particular period of time for information. Further, the infliction of repeated blows was sufficient evidence to justify an instruction upon this issue, as was proof that the victim was unarmed, apparently offered no provocation and that the accused was cool and calm immediately after the homicide according to at least one witness.

*State v. McNish*, 727 S.W. 2d at 495 (citation omitted).

McNish does not refer to any case law to support his claim and this court is not aware of any U.S. Supreme Court opinion holding that premeditation cannot be formed in an instant. The decision of the Tennessee Supreme Court was neither contrary to, nor did it involve an unreasonable application of, federal law. *See, e.g., Lane v. Carlton*, 149 F. App'x (6th Cir. 2005).

[A]lthough the charge did contain a statement indicating that the "intent or design to kill may be conceived and deliberately formed in an instant," the jury instructions, considered in their entirety, sufficiently and explicitly convey the principle that Lane's mental state, at the time of the crime, must have been "sufficiently free from excitement and passion as to be capable of pre-meditation." Indeed, in requiring the prosecution to prove all elements of the crime beyond a reasonable doubt, not only did the charge provide that premeditation to kill be formed by a mind free from excitement and passion, but the trial judge also instructed the jury that the design to kill must, in all instances, be formed with deliberation and pre-meditation. By so coupling the concept of premeditation with the deliberation necessary to distinguish

first-degree murder from other homicides, the instruction complies with constitutional principles. There is, therefore, no substantive merit to Lane's jury charge challenge in this regard.

*Id*. at 379.

## B.    Instruction that malice is presumed.

The trial court instructed the jury as follows:  "If it is shown beyond a reasonable doubt that the alleged victim was killed, the killing is presumed to be malicious in the absence of evidence which would rebut the implied presumption."  [Addendum I, Transcript of the Evidence, Vol. IV, volume XI, p. 1006].  The trial court subsequently charged the jury with respect to presumptions or inferences:

> The Court has charged the jury concerning a certain presumption or inference that the jury may make in regard to certain evidence in this case. However, the jury is not required to make this p-esumption [sic] or inference. It is the exclusive province of the jury to determine whether the facts and circumstances shown by all the evidence in the case warrant the presumption or inference which the law permits the jury to draw.  The presumption or inference may be rebutted by direct or circumstantial evidence or both, whether it exists in the evidence of the State or is offered by the defendant, and the burden of proof remains as always upon the State to prove beyond a reasonable doubt each and every element that constitutes the offense before the defendant can be convicted.  Although not required by law to do so, when the defendant offers proof of an explanation to rebut the presumption or inference thus raised, you should consider such proof along with all the evidence to determine not only the correctness of the presumption or inference, but the reasonableness of the defendant's explanation.  You are not bound to accept either and, as aforesaid, the burden of proving guilt of the offense charged beyond a reasonable doubt is upon the State.

[*Id*. at 1018-1019].

McNish alleges that the instruction on the presumption of malice was an impermissible shifting of the burden of proof in violation of *Sandstrom v. Montana*, 442 U.S.

510 (1979), and *Francis v. Franklin*, 471 U.S. 307 (1985). In *Sandstrom*, the U.S. Supreme Court held that a jury instruction containing a presumption that one intends the consequences of his voluntary actions violates the due process clause of the constitution by abridging the principles of presumption of innocence and burden of proof. 442 U.S. at 524. The holding was specifically applied to presumed malice instructions in *Francis*. 471 U.S. at 325.

On direct appeal, McNish challenged the presumption of malice instruction under both *Sandstrom* and *State v. Martin*, 702 S.W.2d 560 (Tenn. 1985). [Addendum 2, Doc. 2A, Brief of the Appellant, p. 49]. In *Martin*, the Tennessee Supreme Court held that, in light of *Sandstrom* and *Francis*, a jury instruction that "the killing is presumed to be malicious in the absence of evidence which would rebut the implied presumption" was inadequate and constitutionally insufficient. *Id.* at 563-65. The supreme court reasoned that the jury charge "did not explain that rebuttal could be established by evidence from the State or from the accused." *Id.* at 564.

In considering the issue in McNish's case, however, the Tennessee Supreme Court distinguished *Martin*:

> [A]n examination of the jury instructions in the present case makes it clear that the trial judge was referring only to a permissible inference which the jurors were free to draw or not to draw from the evidence. There were explanatory instructions given in this case which were not present in *Martin*, *supra*, and throughout the instructions the trial judge made it clear that the State had the burden of establishing beyond a reasonable doubt every element of the offense charged. There was no instruction impermissibly shifting the burden of proof as found in *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979).

*State v. McNish*, 727 S.W. 2d at 495.

The decision of the Tennessee Supreme Court was neither contrary to, nor did it involve an unreasonable application of, federal law. The trial court made it clear, in its instructions on presumptions, that it was for the jury to determine whether the presumption was warranted based upon the facts of the case.

> **XII.    The jury instruction in the penalty phase limited the jury's consideration of mitigation and denied petitioner his right to individualized sentencing as guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

McNish alleges that the jury instruction on mitigation was unconstitutional because the jury was not told it could consider non-statutory mitigating circumstances. He relies on *Lockett v. Ohio*, 438 U.S. 586 (1978), in which the Supreme Court stated that, in a death penalty case, the sentencer should "not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id*. at 604 (emphasis in original).

In charging the jury on the statutory mitigating circumstances, the trial court began the instruction as follows: "In arriving at the punishment the jury shall consider, as heretofore indicated, any mitigating circumstances which shall include, *but not be limited to* the following ....." [Addendum I, Transcript of the Evidence, Vol. V, volume XII, p. 1136 (emphasis added)]. The Tennessee Court of Criminal Appeals made the same observation and concluded that the instruction did "not in any manner preclude the jury from considering non-statutory mitigation, but in fact affirmatively direct[ed] the jury that it *should* consider

*any* mitigating circumstance, statutory and non-statutory." *McNish v. State*, 1999 WL 604436 at *23 (emphasis in original). The decision of the Tennessee Court of Criminal Appeals was neither contrary to, nor did it involve an unreasonable application of, federal law.

### XIII.   The penalty phase jury instructions impermissibly shifted the burden to Mr. McNish in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

The trial court instructed the jury as follows: "If the jury unanimously determines that at least one statutory aggravating circumstance or several statutory aggravating circumstances have been proved by the State beyond a reasonable doubt, and said circumstance or circumstances are not outweighed by any sufficiently substantial mitigating circumstances, the sentence shall be death." [Addendum I, Transcript of the Evidence, Vol. V, volume XII, p. 1137]. McNish alleges that this instruction impermissible shifted the burden of proof to him to establish that mitigating circumstances outweighed aggravating circumstances.

On direct appeal, McNish argued that the instruction was unconstitutional because it denied the jury discretion in imposing the death penalty. [Addendum 2, Doc. 2A, Brief of the Appellant, pp. 39-40]. He did not raise the issue of whether the instruction shifted the burden of proof and thus has procedurally defaulted that claim. In any event, the claim lacks merit. *See State v. Dicks*, 615 S.W. 2d 126, 130-31 (Tenn. 1981) (jury instruction that the death penalty may be imposed "only upon finding that one or more aggravating circumstances ... are present, and ... are not outweighed by any mitigating circumstance"

"meets the requirement set forth in *Gregg v. Georgia*, 428 U.S. 153, 192, 96 S.Ct. 2090, 2934, 49 L.Ed.2d 859 (1976) that a jury be given guidance in determining punishment when the death penalty is a possible punishment").

### XIV. The Tennessee death penalty statute violates the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

    **A.**    **Tennessee's Death Penalty Statute allows the jury to afford too little weight to non-statutory mitigating factors.**

    **B.**    **Tennessee's death penalty statute does not require the jury to determine that death is the appropriate punishment.**

    **C.**    **Tennessee's death penalty statute does not require written findings of fact relative to the presence of aggravating and mitigating factors, thereby precluding effective appellate review.**

    **D.**    **Tennessee's death penalty statute allows the State to argue last in the sentencing phase.**

    **E.**    **Tennessee's death penalty statute prohibits the jury from being informed of the consequences of a non-unanimous verdict in the sentencing phase.**

    **F.**    **Tennessee's death penalty statute does not allow the correction of misconceptions about the length of a life sentence, parole eligibility, consecutive versus concurrent sentences, the cost of incarceration versus the cost of execution, the deterrent effect of the death penalty, and the idea that electrocution and lethal injection causes instantaneous and painless death.**

    **G.**    **Tennessee's death penalty statute is unconstitutional because it is imposed on the basis of race, gender, geography, and economic status.**

**H.**     **Tennessee's death penalty statute is unconstitutional due to the amount of prosecutorial discretion involved in its imposition.**

**I.**     **The absence of uniform standards for death qualification of a jury violates the equal protection clause and leads to the arbitrary and capricious imposition of the death penalty.**

McNish contends that Tennessee's death penalty statute is unconstitutional for the foregoing reasons. He has failed to cite, however, any authority holding the Tennessee Death Penalty Act unconstitutional and the court notes the Sixth Circuit has held that Tennessee's death penalty statute is constitutional. *Workman v. Bell*, 178 F.3d 759, 778 (6th Cir. 1998), *cert. denied*, 528 U.S. 913 (1999). *See also Blystone v. Pennsylvania*, 494 U.S. 299, 305 (1990) (holding that the Eighth Amendment is satisfied by a state scheme that mandates a death penalty if a jury finds one aggravating circumstance and no mitigating ones or none that outweigh it).

The Tennessee state courts rejected McNish's allegations that the death penalty statute is unconstitutional. *State v. McNish*, 727 S.W. 2d at 494 (Tennessee Supreme Court finding "without merit" the challenge to "the constitutionality of the Tennessee statutory provisions respecting the death penalty in first degree murder cases"); *McNish v. State*, 1999 WL 604436 at *23 (finding by the Tennessee Court of Criminal Appeals "that none of [McNish's] challenges to the constitutionality of the death penalty bears merit"). McNish is not entitled to relief on this issue.

**XV.**     **The length of time between imposition of sentence and execution constitutes cruel and unusual punishment.**

This claim has not been presented to the state courts, either on direct appeal or in post-conviction proceedings. Accordingly, McNish has procedurally defaulted this claim. In any event, this claim lacks merit. *See Knight v. Florida*, 528 U.S. 990 (1999) (Thomas, J., concurring in denial of certiorari) ("I write only to point out that I am unaware of any support in the American constitutional tradition or in this Court's precedent for the proposition that a defendant can avail himself of the panoply of appellate and collateral procedures and then complain when his execution is delayed.").

### XVI. Execution of the petitioner would violate the Eighth Amendment because petitioner is innocent of first degree murder and innocent of the death penalty.

McNish maintains his innocence and seeks an evidentiary hearing to present his evidence of innocence. This claim was not presented to the state courts and has been procedurally defaulted. In any event, the claim lacks merit. The record does not cast doubt on McNish's guilty, let alone meet the "extraordinarily high" threshold for demonstrating "actual innocence" which "would render the execution of a defendant unconstitutional." *Herrera v. Collins*, 506 U.S. 390, 417 (1993).

### XVII. Death by lethal injection is cruel and unusual punishment which violates the Eighth Amendment to the United States Constitution.

This claim has not been presented to the state courts, either on direct appeal or in post-conviction proceedings, because it was not an issue at that time. Nevertheless, as far as this court is aware, Tennessee's provision for death by lethal injection has not been ruled unconstitutional. *See, e.g., Harbison v. Little*, 571 F.3d 531, 539 (6th Cir. 2009); *State v.*

*Jordan*, 325 S.W.3d 1, 87-88 (Tenn. 2010); *Thomas v. State*, 2011 WL 675936 at *46 (Tenn. Crim. App. Feb. 23, 2011).

**XVIII.      Death by electrocution is cruel and unusual punishment which violates the Eighth Amendment to the United States Constitution.**

This claim was raised in post-conviction proceedings and is now moot.  In 2000, the Tennessee legislature passed a law providing for execution by lethal injection.  Tenn. Code Ann. § 40-23-114(a).  Because he committed his offense prior to January 1, 1999, McNish may elect by written waiver to be executed by electrocution instead of lethal injection.  *Id*. § 40-23-114(b).  Should he choose to make such a waiver, McNish would waive any claim that electrocution is unconstitutional.  *See Stewart v. LaGrand*, 526 U.S. 115, 119 (1999).

**XIX.   The errors which occurred during Mr. McNish's state capital proceedings constitute a fundamental denial of due process.**

McNish alleges that the cumulative effect of the errors that occurred during his trial rendered his trial fundamentally unfair.  This claim was not presented to the state courts and has been procedurally defaulted.  In any event, the claim lacks merit.

The Sixth Circuit has held in the past that, regardless of whether each of a petitioner's alleged errors, standing alone, would require a finding of deprivation of due process, a court may look to whether the cumulative effect of the errors was such that the petitioner was denied fundamental fairness.  *See, e.g., Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *Walker v. Engle*, 703 F.2d 959, 968 (6th Cir. 1983).  These cases, however, were decided prior to the effective date of the Antiterrorism and Effective Death Penalty Act of

1996 (AEDPA), which amended 28 U.S.C. § 2254 with regard to the standard of review in habeas corpus cases.

The Supreme Court has not held that a district court may look to the cumulative effects of trial court errors in deciding whether to grant habeas corpus relief. *See Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006) (death-penalty decision stating, "[T]he law of this Circuit is that cumulative error claims are not cognizable on habeas because the Supreme Court has not spoken on this issue. No matter how misguided this case law may be it binds us."); *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005) (death-penalty decision stating, "[W]e have held that, post-AEDPA, not even constitutional errors that would not individually support habeas relief can be cumulated to support habeas relief."); *Scott v. Elo*, 302 F.3d 598, 607 (6th Cir. 2002) ("The Supreme Court has not held that constitutional claims that would not individually support habeas relief may be cumulated in order to support relief."); *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002) (death-penalty decision stating, "The Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief."); *but see DePew v. Anderson*, 311 F.3d 742, 751 (6th Cir. 2002) (constitutional errors that might have been harmless when considered individually maybe be cumulated in a capital case, leading to a reversal of a death sentence).

IV.     Conclusion

McNish is not entitled to relief under 28 U.S.C. § 2254 and his motion for partial summary judgment will be **DENIED**, the respondent's motion for summary judgment will be **GRANTED**, and the petition for the writ of habeas corpus will be **DENIED**.  The stay of execution previously entered in this matter will be **VACATED**.  The petitioner having failed to make a substantial showing of the denial of a constitutional right, a certificate of appealability **SHALL NOT ISSUE**.  28 U.S.C. § 2253(c).

**AN APPROPRIATE ORDER WILL ENTER.**

_____s/ Thomas W. Phillips_____
United States District Judge